Honorable S. Kate Vaughan

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

NOAH SAEEDY, VISHAL SHAH, TINA WILKINSON, and M.C., a minor, by and through his natural parent and legal guardian, Moses Chatmann III, individually, and on behalf of all others similarly situated,

Plaintiffs,

v.

MICROSOFT CORPORATION, a Washington Corporation,

Defendant.

Case No. 2:24-cv-00219 SKV

**PLAINTIFF'S OPPOSITION TO DEFENDANT MICROSOFT'S MOTION TO COMPEL ARBITRATION AND STAY CASE**



SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

# TABLE OF CONTENTS


I. INTRODUCTION ........ 1

II. BACKGROUND ........ 1

  A. Plaintiffs' Use of Edge ........ 1

  B. The Edge Terms ........ 3

  C. The MSA ........ 5

III. ANALYSIS ........ 8

  A. Legal Standard ........ 9

  B. Microsoft Waived Its Right to Compel Arbitration ........ 11

  C. The Edge Terms Govern the Use of Edge ........ 12

  D. Under the Edge Terms, No Agreement to Arbitrate Exists ........ 14

    1. Plaintiffs Never Consented to the Edge Terms ........ 14

    2. The Edge Terms Contain No Arbitration Provision for Windows Users ........ 16

  E. Even If the MSA Governs, Microsoft Cannot Compel Arbitration of Plaintiffs' Claims ........ 17

    1. Microsoft Has Not Shown Plaintiffs Assented to Any Terms of Use in the MSA ........ 17

    1. Plaintiffs' Claims Are Outside the Scope of the MSA's Arbitration Clause ........ 22

    2. The MSA Arbitration Provision is Unenforceable Because it is Unconscionable ........ 26

  F. Notwithstanding any Other Argument, Plaintiffs' Claims for Public Injunctive Relief Cannot be Forced into Arbitration ........ 29

IV. CONCLUSION ........ 29




SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

## I. INTRODUCTION

Microsoft's Motion to Compel Arbitration and Stay Case ("Motion") should be denied for four reasons. First, Microsoft has waived its right to compel arbitration by litigating in court, filing motions, engaging in discovery, seeking removal, and, only as a last resort, attempting to compel arbitration of Plaintiffs' claims. Second, the Microsoft Service Agreement ("MSA") does not govern Plaintiffs' claims. Rather, the Microsoft Software License Terms (the "Edge Terms"), which specifically apply to the Edge Browser (the subject of this case), govern. Further, the Edge Terms only require arbitration of claims concerning the use of Edge on Non-Windows Devices. Here, the Plaintiffs all used Edge on Windows Devices, and therefore need not arbitrate their claims. Third, even if the MSA governs, Microsoft's motion must still be denied as Plaintiffs did not assent to the MSA terms, their claims fall outside the scope of the MSA arbitration provision, and, in any event, the MSA's arbitration provision is unconscionable because Plaintiffs had no meaningful opportunity to negotiate or even review the extensive and convoluted terms of the MSA. Moreover, the MSA's ban on public injunctive relief, opportunity of unilateral modification and retroactive application of such by Microsoft, and limitations on liability and damages result in multiple substantively unconscionable provisions. Finally, in no case can Plaintiffs' claims for public injunctive relief be sent to arbitration, under *McGill v. Citibank, N.A.*, 2 Cal. 5th 945, 952 (2017) and binding Ninth Circuit case law. This Court should deny Microsoft's motion to compel arbitration and stay this case.

## II. BACKGROUND

### A. Plaintiffs' Use of Edge

Plaintiffs are all users of Microsoft's Edge internet browser. Complaint (Dkt. No. 1-1), ¶¶7, 11, 15, 20. Plaintiffs Saeedy, Shah, and Wilkinson have used Edge since at least June 2021. *Id*. ¶¶7, 11, 15. Plaintiff M.C., a minor, has used Edge since at least 2020. *Id*. ¶20. Plaintiffs have used Edge for various purposes, including to engage in sensitive financial activities, access their email accounts, complete schoolwork, conduct personal and work-related searches through search



SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

engines like Google, Yahoo, DuckDuckGo, and Bing, and purchase goods through e-commerce websites like Amazon, eBay, and Best Buy. *Id.* ¶¶7–24.

Saeedy used Edge on a personal computer; Shah used Edge on a computer provided by his workplace; and Wilkinson and M.C. used Edge on both personal computers and school-provided computers. Compl. ¶¶7, 11, 15, 20. Plaintiffs all have computers that run on Microsoft's Windows operating system. Declaration of Noah Saeedy ¶19; Declaration of Vishal Shah ¶16; Declaration of Tina Wilkinson ¶19; Declaration of Moses Chatmann III ¶11. None of Plaintiffs sought out the Edge Software. Rather all of Plaintiffs' devices came pre-installed with Edge as the default internet browsing software. Saeedy Decl. ¶19; Shah Decl. ¶16; Wilkinson Decl. ¶19; Chatmann Decl. ¶¶11-13. Plaintiffs were never presented with the Edge Terms requiring consent prior to their use of Edge. Saeedy Decl. ¶¶7, 13, 20; Shah Decl. ¶¶7, 13, 17; Wilkinson Decl. ¶¶7, 13, 20; Chatmann Decl. ¶¶5, 13.

Wilkinson and Saeedy created Microsoft accounts before Edge was released in 2015. Wilkinson Decl. ¶8; Saeedy Decl. ¶8. Shah created a Microsoft account in November 2016, which predated his use of Edge beginning around June 2021. Shah Decl. ¶8. None of them believed any terms or conditions presented to them when they created their Microsoft accounts would apply to their use of Edge—in Saeedy and Wilkinson's case because Edge had not yet been released, and in Shah's case because he did not begin using Edge until several years later. Saeedy Decl. ¶8; Shah Decl. ¶8; Wilkinson Decl. ¶8.

Though it is Plaintiffs' strong contention the MSA is not applicable to their claims, to respond to Microsoft's arguments: Plaintiffs were not presented with any terms or conditions before using their devices for the first time and did not believe they were agreeing to any of Microsoft's terms or conditions by using their computers. Saeedy Decl. ¶20; Shah Decl. ¶17; Wilkinson Decl. ¶20. Chatmann Decl. ¶13.

Wilkinson and Saeedy do not recall receiving "interrupt notices" while using Edge, but upon reviewing the notices Microsoft has provided in support of its Motion they found those



SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

notices to be vague, and neither of them believed that by clicking “Next” they were agreeing to any new binding terms or conditions—none of which were hyperlinked—regarding updates to the MSA. Wilkinson Decl. ¶16; Saeedy Decl. ¶16. If Microsoft provided them notice of updates to the MSA by email, such notice was ineffective because Wilkinson and Saeedy both receive countless promotional emails, and neither believed they agreed to any binding terms or conditions with Microsoft by reviewing or clicking on emails. Wilkinson Decl. ¶¶17–18; Saeedy Decl. ¶¶17-18.

**B. The Edge Terms**

According to Microsoft itself, the use of the Microsoft Edge internet browser is governed by a distinct set of “Microsoft Software License Terms” (*i.e.*, the Edge Terms) that Microsoft intended to apply specifically and only to Edge. Declaration of Yana Hart, Exhibits B & C. It is the Edge Terms, not the MSA, that determines whether there is a binding agreement to arbitrate Plaintiffs’ claims.

Users may access the Edge Terms by navigating to “edge://terms.” Hart Decl. Ex. B at 1; Ex. C at 1. Many users are likely to never see or even become aware of the Edge Terms unless they intentionally search for the Edge Terms, because users who purchase, borrow, or are given devices with Edge pre-installed (*e.g.*, computers running Microsoft’s Windows operating system) are not otherwise ever presented with the Edge Terms.[1] The Edge Terms neither reference nor incorporate the MSA. *See generally* Hart Decl. Exs. B & C.

At the top of the version of the Edge terms in effect when the Complaint was filed is an unnumbered introductory paragraph that expressly states:

[1] If Edge is not pre-installed, the Edge Terms would first be presented to users during the Edge download process. Compl. ¶154, Image 1. The Edge Terms are presented via a small window that users must scroll through to view all the Terms. *Id.* Immediately below the window is a blue hyperlink reading “Privacy Statement.” *Id.* ¶155, Image 1. To complete the download process and install Edge, the individual downloading the software must click a button stating, “Accept and download,” which appears directly below the hyperlink to the privacy statement. *Id.* But users need not scroll through to the end of the Edge Terms or click on the link to the Privacy Statement to click on the “Accept and download” button. *Id.* ¶155, Image 2.



SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

> **These license terms are an agreement between you and Microsoft Corporation (or one of its affiliates). They apply to this software published by Microsoft and any software updates** ("Software") (except to the extent such Software or updates are accompanied by new or additional terms, in which case those different terms apply prospectively and do not alter your or Microsoft's rights relating to pre-updated Software).

Hart Decl. Ex. B, at 1 (emphasis added).[2]

> Below the unnumbered introductory paragraph, the Edge Terms are separated into two numbered sections. Section 1, titled "**MICROSOFT EDGE FOR WINDOWS DEVICES**," applies to users who install and use Edge on "any Windows platform" (*i.e.*, a device running on Microsoft's Windows operating system). Hart Decl. Ex. B at 1. Section 2, titled **MICROSOFT EDGE FOR NON-WINDOWS DEVICES**, applies to users who use Edge on non-Windows devices (i.e., MacOS and Linux). *Id.* at 2. Section 2 contains a provision that states:
> **IF YOU LIVE IN (OR ARE A BUSINESS WITH A PRINCIPAL PLACE OF BUSINESS IN) THE UNITED STATES, PLEASE READ THE "BINDING ARBITRATION AND CLASS ACTION WAIVER" SECTION 2.14 BELOW. IT AFFECTS HOW DISPUTES ARE RESOLVED.**

*Id.* at 2 (emphasis in original).[3] Buried among Section 2's 19 subsections is subsection 2.14, titled "**Binding Arbitration and Class Action Waiver**," which reads:

> This Section applies if you live in (or, if a business, your principal place of business is in) the United States. If you and Microsoft have a dispute, you and Microsoft agree to try for 60 days to resolve it informally. If you and Microsoft can't, you and Microsoft agree to **binding individual arbitration before the American Arbitration Association** under the Federal Arbitration Act ("FAA"), and **not to sue in court in front of a judge or jury**. Instead, a neutral arbitrator will decide. **Class action lawsuits, class-wide arbitrations, private attorney-general actions,** and any other proceeding where someone acts in a representative capacity **are not allowed**; nor is combining individual proceedings without the consent of all parties. The complete Arbitration Agreement contains more terms and is at https://aka.ms/arb-agreement-1. You and Microsoft agree to these terms.

---

[2] The Edge Terms were recently updated in June 2024. *See* Hart Decl. Ex. C. The current Terms contain similar language. *See id.*

[3] This language was moved to the unnumbered introductory section of the June 2024 version of the Edge Terms. Hart Decl. Ex. C, at 1. Like the previous version of the Edge Terms, the June 2024 version is divided into two numbered sections, with only Section 2 containing an arbitration provision. *See id.* at 5.



SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

*Id*. at 5(emphasis in original). The hyperlink embedded in subsection 2.14 leads users to a document titled "ARBITRATION AGREEMENT," which defines "dispute" as "any claim or controversy between you and us concerning the software, its price, or this agreement, under any legal theory including contract, warranty, tort, statute, or regulation, except disputes relating to . . . intellectual property rights." *Id*.; Hart Decl. Ex. D. Subsection 2.15, entitled "**Entire Agreement"** (emphasis in original), states, "[t]his agreement, and any other terms Microsoft may provide for supplements, updates, or third-party applications, is the ***entire agreement for [Edge]."*** Hart Decl. Ex. B at 5 (emphasis added).

Notably, the Edge Terms make no mention of the MSA. And despite Microsoft's clear intent and unambiguous language for the Edge Terms to govern individuals' use of Edge,[4] Microsoft instead asks the Court to compel arbitration under a separate agreement—the MSA—which does not govern the use of Edge Terms.

**C. The MSA**

The MSA has existed in various iterations since at least 2012. *See* Declaration of Suzanne Fogarty (Dkt. No. 7), Exhibit B at 2–15. Each of these iterations is long and complex, consisting of technical and legal language, and containing numerous hyperlinks to other agreements and policies that Microsoft claims govern the relationship between itself and consumers. *See generally id.*, Exhibits A & B. Per Microsoft, the current iteration of the MSA, effective as of September 30, 2023, consists of 14,268 words (about 33 pages) and takes approximately 55 minutes to read. *See id.*, Ex. A, at 2 ("ESTIMATED READING TIME").

The MSA is an agreement between Microsoft and consumers that governs consumers' "use of the Microsoft consumer products, websites, and services listed at the end of these Terms . . . ("the '**Services**'")." Fogarty Decl., Ex. A, at 2 (emphasis in original). The "Covered Services" enumerated in the MSA lists 133 services to which the MSA applies, but this exhaustive list **does**

[4] Microsoft waived its right to compel arbitration under the Edge Terms, and thus, cannot argue in its Reply brief that the Court should compel arbitration under the Edge Terms.



SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

**not include Microsoft Edge**. *Id.* at 32–35. The only mention of Edge is in connection with the browser's default homepage, new tab page, and Microsoft's translator service. *See id.* at 34–35 (listing "Default Homepage and New Tab Page on Microsoft Edge" and "Translator for Microsoft Edge"). None of these services are relevant to Plaintiffs' claims, and Plaintiffs make no allegations regarding them. *See generally* Compl. Microsoft could have expressly included use of the Edge browser in its entirety as a "Covered Service," like it did with the dozens of other products, websites, and services listed (*i.e.*, "Bing Apps," "Bing.com," "Microsoft Teams," "Skype.com," "Skype," and "Xbox Live"), but it has repeatedly chosen not to do so. Fogarty Decl. Ex. A, at 32–35. Indeed, Microsoft has never included use of its Edge browser as a "Covered Service" in any iteration of the MSA. *See id.*, Ex. B.

The MSA is updated "every 12-18 months on average" with no notice to or assent from consumers or Plaintiffs. Fogarty's Decl., ¶¶6, 8 (noting of only an interruption notice and a mass email to consumers in 2022 and/or 2023); Saeedy Decl. ¶17; Wilkinson Decl. ¶16. The current version of the MSA consists of 33 pages, with over 74 hyperlinks to additional disclosures/statements, totaling thousands of pages.[5] Buried 25 pages deep into the MSA, under the heading "Binding Arbitration and Class Action Waiver," consumers can find section 15 of the MSA, which requires consumers to arbitrate their "dispute[s]" with Microsoft "**in binding individual arbitration before the American Arbitration Association ('AAA') under the Federal Arbitration Act ('FAA'), and not to sue in court in front of a judge or jury."** See Fogarty Decl. Ex. A, at 25–26 (emphasis in original). As Microsoft points out, subsection 15(a) defines "dispute" as, among other things, "[a]ny claim or controversy . . . concerning the Services, . . . your Microsoft account, . . . or these Terms, under any legal theory including contract, warranty, tort, statute, or regulation . . . ." *Id.* at 26; Motion at 14.

---

[5] For full access to all hyperlinks and documents, *see Microsoft Services Agreement,* MICROSOFT, https://www.microsoft.com/en-us/servicesagreement (last visited July 12, 2024).



SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

The current version of the MSA also includes a heading entitled "Your Privacy," wherein Microsoft provides a hyperlink to its Privacy Statement and asks consumers to "[p]lease read the Microsoft Privacy Statement . . . as it describes the types of data we collect from and your devices ('**Data**'), how we use your Data, and the legal bases we have to process your Data." *See* Fogarty Decl. Ex. A at 2. However, prior to July 2015 (during the periods when Plaintiffs opened their respective accounts), Microsoft did not have a single Privacy Statement. Hart Decl. Ex. A at 21–22. The 2023 MSA states that "[w]here processing is based on consent and to the extent permitted by law, by agreeing to these Terms, you consent to Microsoft's collection, use and disclosure of Your Content[6] and Data as described in the Privacy Statement." Fogarty Decl. Ex. A at 1. Microsoft's Privacy Statement, which was introduced sometime in or after July 2015, has been changed over 50 times since 2015, **without notice to or consent from consumers**.[7]

According to Microsoft, the Privacy Statement describes how Microsoft collects and uses consumer data. *See* Declaration of Xiang Li, Exhibit D. The Privacy Statement is very lengthy and highly convoluted. For example, the current iteration of the Privacy Statement relied on by Microsoft is 165 pages. *Id*. Critically missing from the disclosure is that not only does Microsoft collect user data from user search activity, but it also collects content from the webpages users browse, such as Amazon, Best Buy eBay, and Walmart. Compl., ¶¶ 99, 102, 106, 110, 112, 116, 122, 126, 130, 136, 140, 144.

In Microsoft's Motion to Compel Arbitration, Microsoft distracts the Court from Plaintiffs' allegations regarding their use of *Edge* and instead asserts the MSA is the governing contract. To do this, Microsoft focuses on Plaintiffs' Microsoft accounts, their alleged use of "Services" under

---

[6] The MSA defines "Your Content" as "your communications with others; postings submitted by you to Microsoft via the Services; and the files, photos, documents, audio, digital works, livestreams and videos that you upload, store, broadcast, create, generate, or share through the Services or inputs that you submit in order to generate content." Fogarty Decl. Ex. A, at 2.

[7] *Change History for Microsoft Privacy Statement,* MICROSOFT, https://privacy.microsoft.com/en-US/updates (last visited July 11, 2024); *see also* Fogarty Decl. ¶¶ 6, 8 (stating Microsoft updated the terms of its MSA "every 12-18 months on average" but intentionally omitting that it also updated the terms of its Privacy Statement and omitting any process for notification of Plaintiffs regarding its 50+ updates to Privacy Statement).



SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

the MSA (specifically the Bing search engine), and Microsoft's Privacy Statement (which did not exist as a single statement prior to Plaintiffs' opening of their accounts), which is incorporated by reference into the MSA. Motion at 1–2. In fact, Microsoft's entire argument hinges on the MSA governing its relationship with Plaintiffs, based solely on these three reasons. But none of these are central to Plaintiffs' allegations. *First*, the Complaint alleges that even when users do not log into a Microsoft account, Microsoft still collects data from Edge users in violation of users' privacy – it is just that Microsoft is able to collect *additional* personal user data from Edge users when they are logged into their Microsoft accounts. Compl., ¶¶ 2, 23, 36, 40, 45, 47, 49, 51, 52, 56, 60, 63, 65, 69, 72, 76, 77, 80, 83, 88, 92, 96, 106, 112, 116, 120, 126. The central issue is that an individual's general use of Edge, whether signed into a Microsoft account or not, allows Microsoft to surreptitiously collect users' data in violation of their rights. *Second*, the Bing search engine is wholly irrelevant as Plaintiffs do not allege that Microsoft surreptitiously intercepts users' Bing search data and none of their claims arise from the use of Bing. And *third*, the Privacy Statement that did not exist when several Plaintiffs created their Microsoft accounts, is incorporated by reference into the Edge Terms, and does not cover the type of data (webpage content) that Edge collects and intercepts, and users are not put on notice that it is incorporated into the MSA. Hart Decl. Ex. B at 1. Consequently, and for the additional reasons described below, the MSA does not govern the parties' relationship as relates to the issues presented in this case, and the Court should look to the Edge Terms.

## III. ANALYSIS

Notwithstanding the existence of the Edge Terms,[8] Microsoft fails to mention them altogether and instead incorrectly contends the MSA, which omits Edge from its defined Covered Services, governs Plaintiffs' use of Edge and requires their claims to be arbitrated. Microsoft's argument is unavailing for several reasons. *First,* Microsoft waived its right to compel arbitration

[8] Plaintiffs do not concede that arbitration is warranted even if the Edge Terms apply, and Microsoft has made no claim in its Motion that the Edge Terms require Plaintiffs to arbitrate their claims.



SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

by litigating for nearly eight months when this case was originally brought in federal court. *Second*, the Edge Terms' language demonstrates Microsoft's intent to have the Edge Terms, not the MSA, govern the use of Edge. The MSA (and its prior versions) likewise *excludes* Edge from its defined Covered Services. *Third*, Plaintiffs need not arbitrate their claims under the Edge Terms both because several Plaintiffs created their Microsoft Account *before* Microsoft Edge even existed, and thus, could not have possibly anticipated that their creation of a Microsoft account would govern their use of a product later developed, and because the Edge Terms do not contain an arbitration clause for disputes arising out of the use of Edge by Windows users, which Plaintiffs are.[9] *Fourth*, even if the Court determines the MSA applies, Plaintiffs' claims fall outside the scope of the MSA's arbitration clause. *Fifth*, any ambiguity as to which agreement applies and whether Plaintiffs' claims fall within the MSA's arbitration clause must be resolved in Plaintiffs' favor. *See Rui Chen v. Premier Fin. All., Inc.*, 2019 WL 280944, at *2 (N.D. Cal. Jan. 22, 2019) (In deciding whether a genuine issue of fact exists as to formation, "the party opposing arbitration shall receive 'the benefit of all reasonable doubts and inferences.'") (quoting *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 1141 (9th Cir. 1991)). And *sixth*, the MSA is unenforceable due to substantive and procedural unconscionability.

**A. Legal Standard**

Because "arbitration is a matter of contract[,]" a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002). Arbitration is appropriate "only where the court is satisfied that the parties agreed to arbitrate *that dispute*." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 297 (2010) (emphasis in original). The object of an arbitration clause is to implement a contract, not to transcend it." *Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 205 (1991).

[9] Plaintiff M.C. also uses a school-provided Chromebook. Chatmann Decl. ¶12.



SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

In determining whether to compel arbitration, a court must determine two "gateway" issues: (1) whether there is an agreement to arbitrate between the parties; and (2) whether the agreement covers the dispute. *Howsam*, 537 U.S. at 84. The party seeking to compel arbitration "bears the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence." *Norcia v. Samsung Telecomms. Am., LLC*, 845 F.3d 1279, 1283 (9th Cir. 2017) (quoting *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014). The burden is substantial, and the court must give the party denying the existence of an agreement to arbitrate "the benefit of all reasonable doubts and inferences that may arise." *Three Valleys Mun. Water Dist.*, 925 F.2d at 1141 (internal quotes omitted).

In order to determine whether the parties agreed to arbitrate, courts apply ordinary state-law contract principles. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1955). The parties agree that Washington and California law govern here, albeit for different reasons.[10] California and Washington law are substantially similar. Under California law, "a valid contract requires the mutual consent of the parties, which is generally achieved through the process of offer and acceptance." *Snow v. Eventbrite, Inc.*, 2020 WL 6135990, at *3 (N.D. Cal. Oct. 19, 2020) (internal citations omitted). Washington courts apply the manifest theory of contract interpretation: "[t]he role of the court is to determine the mutual intentions of the parties according to the reasonable meaning of their words and acts." *Fisher Props. Inc. v. Arden-Mayfair, Inc.*, 106 Wn.2d 826, 837 (1986).

An arbitration agreement may be invalidated by "generally applicable contract defenses, such as fraud, duress, or unconscionability[.]" *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011). In deciding whether a genuine issue of fact exists as to formation, "the party opposing

[10] Given that Plaintiffs are residents of Washington and California, and Microsoft is a Washington company that conducts significant business in California, the laws of those states govern interpretation of the Edge Terms, MSA, and Privacy Statement. *See* Compl., ¶¶7, 11, 15, 20, 206–08. Microsoft agrees that California and Washington law govern this matter. However, Plaintiffs disagree with Microsoft's contention that California and Washington law govern because of the MSA's choice of law provision. *See* Motion at 10, n.10.



SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

arbitration shall receive 'the benefit of all reasonable doubts and inferences.'" *Rui Chen*, 2019 WL 280944, at *2 (quoting *Three Valleys Mun. Water Dist.*, 925 F.2d at 1141).

**B. Microsoft Waived Its Right to Compel Arbitration**

"[T]he test for waiver of the right to compel arbitration consists of two elements: (1) knowledge of an existing right to compel arbitration; and (2) intentional acts inconsistent with that existing right." *Hill v. Xerox Bus. Serv., LLC*, 59 F.4th 457, 468 (9th Cir. 2023); *see also Morgan v. Sundance, Inc.,* 596 U.S. 411, 416 (2022) (rejecting the need to show prejudice in asserting a waiver). A party takes "intentional acts inconsistent with its right to arbitrate" when a party "chooses to delay his right to compel arbitration by actively litigating his case to take advantage of being in federal court." *Hill*, 59 F. 4th at 471. "[A] party's extended silence and delay in moving for arbitration may indicate a 'conscious decision to continue to seek judicial judgment on the merits of [the] arbitrable claims,' which would be inconsistent with a right to arbitrate." *Martin v. Yasuda*, 829 F.3d 1118, 1125 (9th Cir. 2016) (quoting *Van Ness Townhouses v. Mar Indus. Corp.*, 862 F.2d 754, 759 (9th Cir. 1988)). A party takes "intentional acts inconsistent with its right to arbitrate" when it "chooses to delay his right to compel arbitration by actively litigating [its] case to take advantage of being in federal court." *Id*. at 471.

The Ninth Circuit has *repeatedly* held that where a defendant moves to dismiss on a key merits issue, it waives its right to arbitrate. *See Martin*, 829 F.3d at 1126 (collecting cases and holding that defendants waived right to compel arbitration where they filed "a motion to dismiss on a key merits issue"); *Newirth v. Aegis Senior Cmtys., LLC,* 931 F.3d 935, 942 (9th Cir. 2019) (same); *Kelly v. Pub. Util. Dist. No. 2*, 552 Fed. Appx. 663, 664 (9th Cir. 2014) (similar); *FBC Mortg., LLC v. Skarg*, 2023 WL 6933359, at *3 (N.D. Cal. Oct. 19, 2023) (denying motion to compel based on waiver where defendants "waited eight months and affirmatively 'engaged in other litigation procedure' to try to dismiss two of [plaintiff's] claims on the merits"); *Van Ness Townhouses*, 862 F.2d at 756, 759 (similar).



SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

Here, for nearly eight months Microsoft deliberately delayed filing its motion to compel.[11] Instead, Microsoft ***moved to dismiss Plaintiffs' originally-filed case on the merits*** and litigated the case in federal court. The parties exchanged their initial disclosures, engaged in several meet-and-confer efforts, negotiated and filed a joint discovery plan structuring the litigation, drafted and revised a joint protective order, and began negotiating an ESI agreement. Plaintiffs even served discovery requests, to which Microsoft was set to respond after Judge Rothstein's order on the motion to dismiss. Plaintiffs had previously provided Microsoft with their email addresses for Microsoft to assess and be able to move to compel arbitration.[12] Even when this case was re-filed in state court, Microsoft removed the case instead of seeking to compel arbitration.

As in *Morgan*, *Newirth,* and *Martin,* Microsoft actively engaged in nearly eight months of litigation, seeking adjudication of the case on the merits and engaging in discovery, all before seeking to compel arbitration. Under Ninth Circuit precedent, Microsoft waived any right it had to compel arbitration.

### C. The Edge Terms Govern the Use of Edge

Before the Court can determine whether there is an agreement to arbitrate, it must first determine which terms govern the dispute. Where parties disagree as to which of two agreements governs their dispute, the court must determine whether the agreements "are separate, each subject to individual interpretation," or "merely interrelated contracts in an ongoing series of transactions." *Int'l Ambassador Programs, Inc. v. Archexpo*, 68 F.3d 337, 339–40 (9th Cir. 1995); *Marsch v. Williams*, 23 Cal. App. 4th 250, 256 (1994) ("Where, as here, the parties have separate contractual relationships, which involved separate enterprises and most importantly separate commercial risks, an arbitration clause which governs one contractual relationship cannot be

[11] Though Plaintiffs' initial case was dismissed, Microsoft deemed the two cases related. *See* ECF 3. In so doing, Microsoft implicitly admitted that the two cases "concern substantially the same parties, property, transaction, or event." *Cf.* LCR 3(g); *Naylor v. United States*, 53 Fed. Cl. 172, 177 (2002) ("This strikes the court as a clear admission that the complaint filed in this court was an attempt to relitigate the same events").

[12] Hart Decl. ¶2.



SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

imposed in the other relationship . . . ."). Contracts are "separate" if they each have a "clear, delineated purpose." *Johnson v. Walmart Inc.*, 57 F.4th 677, 682 (9th Cir. 2023). Where separate contracts exist, the one whose "delineated purpose" is to govern the at-issue conduct or dispute controls. *Id.* at 682–83.

*Int'l Ambassador* and *Johnson* are instructive here. In *Int'l Ambassador*, an American tour company entered into two separate agreements with a company that facilitated tours in Russia. 68 F.3d at 339. The two separate written agreements concerned two types of tour programs: the "April agreement" contained an arbitration clause, while the "July agreement" did not. *Id*. The issue before the district court was whether the two agreements were separate agreements or "merely interrelated contracts in an ongoing series of transactions," such that the arbitration clause in the April agreement covered disputes arising under the July agreement. *Id.* at 339–40. The court determined the agreements were separate and independent because the agreements concerned wholly separate subjects; the July agreement did not contain an arbitration clause, "indicating an intent to treat it differently;" and the proof necessary to establish the arbitration claims under the April agreement had "nothing to do with dispute under the July agreement." *Id.* Therefore, the arbitration provision in the April agreement did not control the parties' separate July agreement. *Id.*

In *Johnson*, the parties asked the court to determine whether an arbitration clause in the Terms of Use agreement the plaintiff accepted when making an online purchase at Walmart governed his relationship regarding *in-store* purchases. *See* 57 F.4th at 680. The court concluded the Terms of Use did not apply to in-store purchases because "the language and subject matter of the contract make clear that by agreeing to the Terms of Use, Johnson did not assent to arbitrate claims that might arise out of a separate, in-store purchase." *Id.* at 682.

As in *Int'l Ambassador*, the MSA and Edge Terms are wholly separate agreements that govern different Microsoft products. There is no overlap between the agreements, and they do not incorporate one another. The MSA specifically lists 133 services to which the MSA applies and



SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

does not include Edge. Similarly, the Edge Terms do not pertain to any Microsoft product other than Edge, and expressly state that these terms "shall govern" the use of Microsoft Edge. Hart Decl. Ex. B at 1. The MSA requires certain arbitration procedures, which Edge omits. Fogarty Decl., Ex. A § 15(d). And, unlike the MSA, the arbitration terms linked-to in the Edge Terms require any small claims or arbitration to be filed within one year of when it could have been filed or otherwise be permanently barred. Hart Decl. Ex. D at 3. Further, like *Johnson*, the MSA and Edge Terms each involved separate consideration, with each requiring adherence to a different set of rules relating to different products and services.

Moreover, the omission of an arbitration provision for Windows users, but the inclusion of an arbitration provision for non-Windows users in the Edge Terms "indicat[es] [Microsoft's] intent to treat [the Edge Terms] differently" than the MSA. *Int'l Ambassador*, 68 F.3d at 340; *see* Section II.B, *supra* (Section 2 titled "**MICROSOFT EDGE FOR NON-WINDOWS DEVICES**" requires arbitration only for non-Windows users). The Edge Terms and the MSA are therefore separate agreements under controlling Ninth Circuit precedent. Because the Edge Terms show a "delineated purpose" to govern use of Edge, they apply.

Of course, since Microsoft has not moved to compel arbitration under the Edge Terms it has waived its right to do so. Nor does Microsoft contend that it provided Plaintiffs with the Edge Terms or obtained Plaintiffs' assent to the terms.

### D. Under the Edge Terms, No Agreement to Arbitrate Exists

Even had Microsoft not waived any argument that arbitration is required under the Edge terms; they do not comprise an agreement to arbitrate for two reasons. First, Plaintiffs never agreed to the Edge Terms. Second, even if Plaintiffs had agreed to the Edge Terms, they do not contain an arbitration clause that applies to Plaintiffs.

#### 1. Plaintiffs Never Consented to the Edge Terms

There are two varieties of contracts formed on the internet that are at issue here: a "clickwrap" (or "clickthrough") agreement, in which users are required to click on an "I agree"



SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

box after being presented with a list of terms and conditions of use, and a "browsewrap" agreement, where users need not manifest assent to the terms and conditions expressly, but assent simply by using the website. *Sellers v. JustAnswer LLC*, 73 Cal.App.5th 444, 463 (2021).

Whether an online contract is valid depends on whether the user is on notice that they are agreeing to terms. For instance, clickwrap agreements are routinely enforced by courts because they require users to physically click "agree" to terms and therefore the person "knows or has reason to know that the other party may infer from his conduct that he assents to those terms." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022). In contrast, a browsewrap agreement typically contains a link to the terms and conditions somewhere on the site but users may not be aware of them or know they are agreeing to any terms because browsewrap agreements do not require users to take any sort of action to assent to the terms. Courts in this Circuit have consistently held this type of agreement to be unenforceable, reasoning that "consumers cannot be expected to ferret out hyperlinks to terms and conditions to which they have no reason to suspect they will be bound." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1179 (9th Cir. 2014).

The Ninth Circuit has held that in order to avoid the unfairness of enforcing contractual terms consumers never intended to accept, courts confronted with online agreements should only enforce the terms if the website operator can show: "(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some actions, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Berman*, 30 F.4th at 856. In order to be conspicuous, "notice must be displayed in a font size and format such that the court can fairly assume that a reasonably prudent internet user would have seen it." *Id.* (citing *Nguyen*, 763 F.3d at 1177).

Because Plaintiffs were not the initial downloader of Edge, they were all presented with a browsewrap agreement that lacks the reasonably conspicuous notice and consumer action required for enforceability. Edge came preinstalled on all Plaintiffs' devices—none of Plaintiffs



SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

downloaded Edge and Plaintiffs were never presented with a clickwrap agreement, or an agreement of any kind. Plaintiffs simply began using Edge as the default browser.[13]

Microsoft's Motion fails to mention the Edge Terms completely, let alone argues they can satisfy the standard for enforceability as to Plaintiffs. That is unsurprising, since the Edge Terms do not appear when a user opens Edge. Instead, the user has to specifically search for the terms in a search engine or enter a specific website address in order to find them. Requiring a user to search out the terms and conditions cannot be considered conspicuous, much less so conspicuous that it "capture[s] the user's attention and secure[s] her assent . . ." *Berman*, 30 F.4th at 857 (citing *Nyguen*, 763 F.3d at 1178 n. 1). And Plaintiffs have all been using Edge without taking any action that unambiguously manifested their assent to be bound by the terms and conditions. Saeedy Decl. ¶20; Shah Decl. ¶17; Wilkinson Decl. ¶20; Chatmann Decl. ¶13. Plaintiffs were unaware the Edge Terms even existed, and even if they were aware and had gone searching for the terms, once Edge is downloaded the user need not click or take any action that would otherwise suggest unambiguous manifestation of assent. *Id.*

Microsoft has waived any argument about the application of the Edge Terms. But even had it not, because Plaintiffs' computers came with Edge predownloaded and Plaintiffs were never required to consent to any terms to use Edge the Edge Terms, as applied here, constitute an unenforceable browsewrap agreement.

**2. The Edge Terms Contain No Arbitration Provision for Windows Users**

There's a further reason that any non-waived argument about the Edge Terms would fail: the Edge Terms do not contain an arbitration provision for Windows users, which all Plaintiffs are.

[13] When an individual specifically *downloads* Edge onto a computer, they are presented with a clickwrap agreement. But after the initial download and consent, the individual using Edge is not presented with any terms of use that must be agreed to prior to use. Instead, they must visit Edge://terms to understand or even know what terms they agree to by using Edge. *See* Hart Decl. Ex. B, at 1; *id.*, Ex. C at 1. Thus, the person who downloads Edge is presented with a clickwrap agreement, but any individual using Edge who is not the downloader is presented with a browsewrap agreement.



SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

As discussed above, the Edge Terms contain two sections. *See* Section II.B, *supra*. Section 1 of the Edge Terms applies to users who install and use Edge on any Windows device. Section 1 contains no arbitration provision. Section 2 applies to users who install and use Edge on any non-Windows device and does contain an arbitration provision. Here, Plaintiffs all used Edge on Windows devices that came with Edge pre-installed as the default internet browsing software. Saeedy Decl. ¶20; Shah Decl. ¶16; Wilkinson Decl. ¶19; Chatmann Decl. ¶13.

Microsoft is a sophisticated entity that knows how to incorporate arbitration provisions where it wishes: Section 2 of the terms contains an arbitration provision, while Section 1 does not. That difference evinces a clear indication of Microsoft's intent to not arbitrate claims regarding Edge by Windows users. Thus, the Edge Terms contain no arbitration provision relevant to Plaintiffs.

**E. Even If the MSA Governs, Microsoft Cannot Compel Arbitration of Plaintiffs' Claims**

Fleeing from the Edge Terms that expressly govern disputes related to Edge, Microsoft tries to shoehorn Plaintiffs' claims into the MSA. But, as explained below, Micosoft's attempts to circumvent the Edge Terms only highlights the shortcomings in Microsoft's approach.

**1. Microsoft Has Not Shown Plaintiffs Assented to Any Terms of Use in the MSA**

"Because 'online providers have complete control over the design of their websites,' [citation], 'the onus must be on website owners to put users on notice of the terms to which they wish to bind consumers[.]'" *Berman*, 30 F.4th at 857 (citing *Sellers* 73 Cal. App. 5th at 465; *Nguyen*, 763 F.3d at 1179). "In the context of electronic consumer agreements or transactions, mutual assent frequently turns on whether the consumer had reasonable notice of a merchant's terms of service agreement." *Needleman v. Golden 1 Credit Union*, 474 F. Supp. 3d 1097, 1103 (N.D. Cal. 2020). "Reasonable notice requires that a user have either actual or constructive notice of an agreement's terms." *Id*. "Constructive notice occurs when a consumer has inquiry notice of



SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

the terms of service and takes an affirmative action to demonstrate assent to them." *Id.* "Inquiry notice . . . hinges on whether a reasonably prudent user would have been aware of the applicable terms." *Id.* "Whether a particular website reasonably communicated the existence of the terms is a fact-intensive inquiry that depends on the design and content of the website and the agreement's webpage." *Id.* "While [i]nternet commerce has exposed courts to many new situations, it has not fundamentally changed the requirement that [m]utual manifestation of assent, whether by written or spoken word or by conduct, is the touchstone of contract." *Sellers*, 73 Cal. App. 5th at 460 (internal citations omitted).

"Even if an offeree does not know all of the terms of an offer, he may be held to have accepted, by his conduct, whatever terms the offer contains so long as there was a sufficient outward manifestation or expression of assent." *DeLeon v. Verizon Wireless, LLC*, 207 Cal. App. 4th 800, 813-14 (2012) (internal citations omitted). "But when the offeree does not know that a proposal has been made to him this objective standard does not apply. Hence, an offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he was unaware, contained in a document whose contractual nature is not obvious." *Id.*

Here, Microsoft contends Plaintiffs agreed to individual arbitration in first creating and then continuing to use their Microsoft accounts. Motion at 3. According to Microsoft's records, Plaintiffs Wilkinson, Saeedy, and Shah created accounts and agreed to the MSA then in effect on the following dates, respectively: December 26, 2013 (*before* Microsoft Edge was released); April 13, 2015 (same); and November 9, 2016 (after Microsoft Edge was released). *Id.* at 4. As for M.C., the minor plaintiff, he has never created or had a Microsoft account.[14]

[14] In reviewing the Microsoft account creation process to support this opposition to Microsoft's Motion, M.C. and his legal guardian, Moses Chatmann, III, have confirmed that M.C. never created a Microsoft account. *See* Chatmann. Decl. ¶6. M.C. has never been presented with the MSA or the Edge Terms and has not agreed to be bound by either. *Id*. However, as a minor, M.C. has disaffirmed any agreement he could have entered into in ceasing his use of Edge on his personal computer. *Id*. ¶14.



SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

Microsoft does not attempt to show that Plaintiffs had actual notice of the existence of the MSA or any of its terms, or that they even read any terms whatsoever. Rather, Microsoft argues that Plaintiffs were put on inquiry notice of the MSA because the account sign-in page used to create a Microsoft account included a hyperlink to the referenced document supposedly providing reasonably conspicuous notice of the terms, and that Plaintiffs must have assented to them by clicking on the "Next" button to proceed to the next page. Motion at 3; Fogarty Decl. ¶3–4. Microsoft's own declaration neither confirms nor provides a record that each Plaintiff clicked "next," and it only vaguely notes that at some point Microsoft's sign-up process included an "I agree" button. A Microsoft account can be created simply by pressing "enter" after each person inputs their email address and password, which is what Plaintiffs did. Also, at the time of Plaintiffs Wilkinson and Saeedy's creation of their Microsoft accounts, Microsoft did not even have a single Privacy Statement, and thus, Microsoft's depiction of the sign-up process cannot be accurate. *See* Fogarty Decl. ¶3 (depicting the button "Next" and hyperlinks to both MSA and "privacy and cookies statement"); *cf.* Hart Decl. Ex. A at 21–22 (admitting that no single privacy statement existed prior to July 2015, and thus, the privacy statement would not have been provided via a hyperlink).

This type of online agreement is nowadays often characterized by courts as a "sign-in wrap" agreement. *See Sellers*, 73 Cal. App. 5th at 463–64; *see also Berman*, 30 F.4th at 856. Accordingly, the individual facts showing Plaintiffs were placed on constructive notice of the terms control. *See Snow*, 2020 WL 6135990, at *5. And, as in *Snow*, there is simply insufficient evidence here.

In *Snow*, the court noted the defendant did not "state the date when the website first adopted its present appearance," did not say, with some exception, "which of . . . two images (if either) each plaintiff would have encountered on the date of his or her use of the platform," and did not "even make clear whether these were the only ways the page has appeared between 2016 and the present." *Id.* at *5. Like the defendant in *Snow*, Microsoft scarcely provides a single



SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

screenshot from the "account creation process" purporting to show how the content appeared on its website about a decade ago, and asserts the "process" and "sign-up flow" have been "materially the same" since no later than October 2012 (Fogarty Decl. ¶¶3–4), but fails to say when the screenshot was taken, whether the image is the same one that each Plaintiff would have encountered on the date of his or her use of the platform, or even make clear whether this was the only way the page has appeared between 2012 and the present. Fogarty also cannot attest that each Plaintiff actually clicked on the button "Next" or "I agree," because Plaintiffs did not do so. As the Ninth Circuit holds, "'online providers [like Microsoft here] have complete control over the design of their websites,' [citation], 'the onus must be on website owners to put users on notice of the terms to which they wish to bind consumers[.]'" *Berman*, 30 F.4th at 857. Here, despite having the ability to require consumers to actually access/scroll through the terms and conditions, Microsoft elected to design a process where consumers do not have to "click" and affirm their agreement to the MSA terms.

Microsoft also asserts Plaintiffs' assent to individual arbitration under the MSA continued after signing up for a Microsoft account when it claims it sent out emails and "pop-up" or "interrupt" notices in connection with *some* updates to the MSA terms. Motion at 6; Fogarty Decl. ¶7. But again, Microsoft's "pop-up" or "interrupt" notices and/or email fall short of the Ninth Circuit's requirement to: (a) provide reasonably conspicuous notice of the new agreement and terms; and (b) obtain proper assent from Plaintiffs to the new and materially different terms. *See Berman,* 30 F.4th at 855. For example, Microsoft supposedly sends a mass email notice notifying account holders of updates to the MSA that will be going into effect. Fogarty Decl. ¶7. For the most recent 2023 MSA update, notice emails were allegedly sent out between August 2, 2023 and September 15, 2023. *Id*. However, Microsoft could only confirm it sent emails to two Plaintiffs: Saeedy (on August 21, 2023) and Wilkinson (on August 31, 2023). *Id*. ¶8(a)–(b). Microsoft also cannot confirm whether Saeedy and Wilkinson ever *received* this mass email and whether they assented to the changes in terms. Importantly, these impersonal mass emails, buried among



SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

hundreds of promotional emails, would "run[] counter to the most basic tenets of mutual assent that a party can take an action, not agree to a contract regarding that action, and yet still be bound by that contract solely on the basis that the other party later sends a note saying so." *See Snow*, 2020 WL 6135990, at *5; *Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 177 (2019) (The Supreme Court has repeatedly proclaimed that "arbitration is strictly a matter of consent.") (cleaned up); *Sifuentes v. Dropbox, Inc.,* 2022 WL 2673080, *4 (N.D. Cal. June 29, 2022) (without any action to "unambiguously manifest [] assent," emails alone were not sufficient for notice to updated terms, therefore the new terms were unenforceable against plaintiff). Microsoft provides no evidence that it required any consumer (or the two Plaintiffs who it purportedly emailed) to read email updates or act on them in any way—such as by clicking on a box or otherwise confirming assent.

Microsoft's "pop-up" or "interrupt" notices are even less informative and provide no ability to assent or even review the changed terms. Fogarty Decl. Ex. D. For instance, Microsoft's interruption notice regarding its announcement that Microsoft is "updating" its MSA without any link to the MSA, explanation of what material changes are being made, when they will be effective, and how (if at all) consumers can object/decline such changes. *Id*. Microsoft also omits the fact that it changed its Privacy Statement (which is incorporated into the MSA) at least 50 times, and Microsoft has yet to notify Plaintiffs and seek their assent to these material changes of the original terms.

Likewise, there could be no meeting of the minds if the parties do not even know which version and, consequently, which terms, of the MSA control. To start, Microsoft cannot even decide which version of the MSA is at issue here. It confusingly argues Plaintiffs' alleged assent to the terms of the then-current MSA at the time they created a Microsoft account should control (Motion at 5, 9–11), while also arguing that Plaintiffs allegedly agreed to later versions of the MSA, including the 2022 and 2023 MSAs. *Id*. at 6–7. This glaring and irreconcilable dichotomy illustrates the inherent weakness of Microsoft's position with respect to formation, not only because it has not met its burden to establish that a valid agreement exists, but moreover because



SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

the terms of the MSA have materially changed over time, including with respect to arbitration. *See, e.g.*, Fogarty Decl. Exs. A, B (the 2022 and 2023 MSA arbitration terms expressly reserve arbitrability issues for the court while in prior versions, arbitrability issues, other than the class action waiver provision, were delegated).

Finally, because a Microsoft account, by definition, does not apply to work or school accounts (Fogarty Decl. ¶ 2 ("A Microsoft account is a service Microsoft provides to consumers and is distinct from business services such as accounts provided for a workplace or school."), Microsoft has not established Plaintiffs' accounts, which have been and continue to be used at least in part for work and/or school/academic purposes (*see* Compl., ¶¶7–24), are even subject to the terms of the MSA.

**1. Plaintiffs' Claims Are Outside the Scope of the MSA's Arbitration Clause**

In addition to the lack of assent to the MSA, Microsoft cannot compel arbitration of Plaintiffs' claims related to their use of Edge because Plaintiffs' claims fall outside the scope of the MSA's arbitration clause. Microsoft fails to provide even a cursory explanation as to why Plaintiffs' claims arising from their *use of Edge*, fall within the scope of the MSA. This is because Microsoft cannot do so—Edge is not one of the 133 "Covered Services" expressly included in the MSA. Fogarty Decl. Ex. A. This alone is sufficient to conclude Plaintiffs' claims fall outside the scope of the MSA's arbitration clause. *See e.g. United States ex. rel. Welch v. My Left Foot Childs. Therapy LLC,* 871 F.3d 791 (9th Cir. 2017) (holding an issue which does not appear in the arbitration provision on its face is outside the scope of arbitrability); *Ramos v. Super. Ct.*, 28 Cal. App. 5th 1042, 1052 (2018) (even under broad arbitration clauses, factual allegations must at least "touch matters" covered by the contract containing the arbitration clause).

*Jackson v. Amazon*, 65 F.4th 1093, 1101 (9th Cir. 2023) is instructive here. There, the Ninth Circuit rejected Amazon's argument that its employees/delivery drivers were required to arbitrate their claim against Amazon for spying on them in closed Facebook groups despite Amazon's overbroad arbitration language. The Court emphasized "even if [plaintiff] had no



SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

contract with Amazon but had been permitted to join the groups for some other reason, he would be able to bring the same claims for invasion of privacy." *Id*. at 1103. The same is true here: Microsoft surreptitiously spied on millions of users browsing Edge, regardless of whether they were logged in to their Microsoft accounts, and regardless of whether they were using Microsoft accounts at all.

In the face of this insurmountable hurdle, Microsoft tries to circumvent its own agreements by arguing that Plaintiffs' claims fall within the broad definition of "dispute" found in the MSA's arbitration agreement because they purportedly concern: (1) Plaintiffs' Microsoft accounts; (2) Plaintiffs' Bing search history; and (3) Microsoft's collection of Plaintiffs' data, which is "a matter squarely within the privacy policies and disclosures incorporated by reference in the MSA and therefore encompassed as a dispute about the terms of the MSA." Motion at 14. These arguments fail, and Microsoft cannot meet its burden to compel arbitration.

**Microsoft Account.** Microsoft argues that, because Plaintiffs were often logged into their Microsoft accounts when using Edge, their claims fall within the MSA's arbitration provision. *See* Motion at 14. Microsoft misses the point. Plaintiffs' claims are not rooted in any "claim or controversy" concerning the use of Microsoft accounts or their functionality. Compl., ¶¶209–365. Instead, Plaintiffs allege that Edge surreptitiously collects users' data and associates it with a variety of unique user identifiers and cookies to identify the user regardless of whether a user is logged into a Microsoft account when using Edge. *Id.* ¶¶34-45.

**Bing.** Microsoft's arguments regarding Bing are irrelevant. None of Plaintiffs' claims arise from their use of the Bing search engine. (*See generally*, Compl.). Plaintiffs' allegations related to Microsoft's data collection from search engines are limited to the Yahoo search engine only. *Id.* ¶71.

**Privacy Policy.** Microsoft contends Plaintiffs' claims arising from data collection fall "squarely" within the privacy policies and disclosures "incorporated by reference in the MSA" and are therefore a "dispute" about the MSA's terms. *See* Motion at 14. ***First***, and fatal to Microsoft's



SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

argument, is the fact that Microsoft changed its Privacy Statement at least 50 times in the last decade without notice to or assent from Plaintiffs and other users, and at the time when at least two Plaintiffs created their Microsoft Accounts, it did not have a single Privacy Statement.

***Second***, the Privacy Statement is also incorporated by reference into the Edge Terms, as both agreements link to the same privacy statement. Hart Dec., Ex. B at 1. Thus, any argument over Microsoft's Privacy Statement does not place the MSA at issue but continues to make the Edge Terms the applicable terms.

***Third***, even if the MSA were at issue (it is not), consumers are not put on notice that the phrase "these Terms" in the MSA's arbitration clause includes the Privacy Statement. The general definition of "Terms" in the MSA does not state it also includes other agreements referenced within the MSA. *See* Fogarty Decl. Ex. A at 2. And the section of the MSA discussing the Privacy Statement merely states: "Where processing [data] is based on consent and to the extent permitted by law, by agreeing to these Terms, you consent to Microsoft's collection, use and disclosure of Your Content and Data as described in the Privacy Statement." Fogarty Decl. Ex. A, at 2. Nothing in that statement informs consumers that the Privacy Statement becomes a part of the MSA or is subsumed within the definition of "Terms."

***Fourth***, even if the Privacy Statement is incorporated into the definition of "Terms," as explained above, the Privacy Statement does not cover the type of data—webpage content—that Plaintiffs allege Edge collects and intercepts. Finally, Microsoft's reliance on its previously litigated cases, *Mendoza* and *Walsh*, for the proposition that Plaintiffs' claims "fall easily within the scope of the MSA's arbitration agreement" misstates the law. *See* Motion at 14. Neither of those cases make any mention of the MSA. Instead, arbitration was compelled in those cases under the Xbox Live Terms of Use where the plaintiffs' claims arose from their use of Xbox Live. *See Mendoza v. Microsoft Inc.*, 2014 WL 4540225, at *3–4 (W.D. Wash. Sept. 11, 2014) (finding that plaintiffs "agreed to arbitrate their claims by accepting the . . . TOUs" and that "dispute falls



SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

within the arbitration provision"); *Walsh v. Microsoft Corp.*, 2014 WL 4168479, at *3 (W.D. Wash. Aug. 20, 2014) (same).

Microsoft's cited cases for its argument that Plaintiffs cannot defeat the presumption of arbitrability are inapt. *See* Motion at 13–15. In *AT&T*, the at-issue contract was a collective bargaining agreement, not a contract of adhesion where one side had an inordinate amount of bargaining power. *See AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 643 (1986). In *Amirhamzeh*, the arbitration clause was clear on its face, and so there was no occasion to construe the arbitration clause against the drafter. *See Amirhamzeh v. Wells Fargo Bank, N.A.*, 2014 WL 12610227, *1 (N.D. Cal. Oct. 31, 2014) (holding that plaintiffs' claims "fall squarely within the scope of the agreement"). Finally, in *Diaz*, the court compelled arbitration because the parties had delegated arbitrability to the arbitrator, not because of any presumption in favor of arbitrability. *See Diaz v. Intuit, Inc.*, 2017 WL 4355075, *3 (N.D. Cal. Sept. 29, 2017).

At the very least, questions of whether the Edge Terms or the MSA govern the parties' relationship, and whether Plaintiffs' claims are encompassed within the MSA's arbitration provision, are ambiguous and must be resolved in Plaintiffs' favor. *See Lamps Plus, Inc.*, 587 U.S. at 182 ("In California, an agreement is ambiguous when it is capable of two or more constructions, both of which are reasonable."); *see also Radliff v. Schmidt*, 27 Wash. App. 2d 205, 211 (2023) ("Language in a contract is ambiguous if it is susceptible to two different but reasonable interpretations or where separate contractual provisions irreconcilably conflict."); *Sandquist v. Lebo Auto., Inc.*, 1 Cal. 5th 233, 248 (2016) ("Where the drafter of a form contract has prepared an arbitration provision whose application to a particular dispute is uncertain, ordinary contract principles require that the provision be construed against the drafter's interpretation and in favor of the nondrafter's interpretation."); *Mendez v. Palm Harbor Homes, Inc.*, 111 Wash. App. 446, 459 (Jun. 6, 2002) ("[U]nder general principles of contract interpretation, the reviewing court construes ambiguities in" adhesion contracts "against the drafter."). Accordingly, if the Court finds any ambiguity in whether the MSA or the Edge Terms



SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

govern Plaintiffs' claims, those ambiguities must be resolved in favor of Plaintiffs. Similarly, ambiguities as to whether the MSA's arbitration provision covers Plaintiffs' claims here must be construed in favor of Plaintiffs and this Court must find those claims are not arbitrable.

**2. The MSA Arbitration Provision is Unenforceable Because it is Unconscionable**

As discussed above, the MSA does not apply to Plaintiffs' claims. But even if it did, the agreement is unenforceable because it is procedurally unconscionable under Washington law.[15]

**a. The Procedural Unconscionability**

A court may invalidate an arbitration agreement based on generally applicable state contract law defenses like unconscionability. *See Chamber of Com. of the U.S. v. Bonta*, 62 F.4th 473, 483 (9th Cir. 2023). Under Washington law, a finding of either procedural or substantive unconscionability is "sufficient to void the agreement." *Burnett v. Pagliacci Pizza, Inc.*, 470 P.3d 486, 494 (Wash. 2020).[16] Here, the MSA terms are procedurally unconscionable.

To determine if a party lacked meaningful choice and an agreement is procedurally unconscionable, Washington courts examine the circumstances surrounding the transaction, including: (1) the manner in which the contract was entered; (2) whether plaintiff had a reasonable opportunity to understand its terms; and (3) whether important terms were hidden in fine print. *Burnett*, 470 P.3d at 495.

Microsoft's MSA (and Edge Terms) are non-negotiable "take it or leave it" contracts of adhesion. Plaintiffs had no meaningful opportunity to negotiate or even review the extensive and convoluted terms of the MSA (and its yearly changes to the material terms of the MSA), its 50 or more versions of its Privacy Statement, and its arbitration clause. *See Ting v. AT&T*, 319 F.3d

---

[15] The arbitration clause in the current iteration of the MSA, which Microsoft contends applies to Plaintiffs' claims, states "the court has exclusive authority: (i) to decide arbitrability, as well as formation, existence, scope, validity, and enforceability of this arbitration agreement . . . ." Fogarty Decl. Ex. A at 26

[16] Under California law, a sliding scale is applied wherein both procedural and substantively unconscionability are taken into account. "In other words, the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." *Armendariz*, 24 Cal. 4th at 114; *Ajamian v. CantorCO2e, L.P.*, 203 Cal. App. 4th 771, 796 (2012).



SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

1126, 1149 (9th Cir. 2003) (finding arbitration agreement procedurally unconscionable contract of adhesion where it is "imposed" on customers "without opportunity for negotiation, modification, or waiver"); *Burnett*, 470 P.3d at 495–96 (finding an arbitration agreement procedurally unconscionable where the plaintiff had no notice of it and was unaware of its existence when signing an employment agreement).

Furthermore, the current iteration of the MSA takes an estimated 55 minutes to read and consists of 14,268 words, with the arbitration clause buried 25-pages deep into the 35-page agreement. Fogarty Decl. Ex. A at 2, 25–28. If one were to open hyperlinks within the MSA, the MSA consists of thousands of pages, and it would take weeks to go through each hyperlink and its numerous hidden disclosures.

Moreover, Microsoft is one of the world's largest companies with vastly greater bargaining power than Plaintiffs. And yet, it contends that each Plaintiff accepted Microsoft's overreaching terms, without providing them with the ability to review them—given their inconspicuously presented manner. It takes on average less than a minute to go through the process of registering a Microsoft account, and consumers are not even required to access or read the terms, or even "click" on the button which is intended to demonstrate consumers' assent to the terms. For these reasons, the Court should find both the Edge Terms and the MSA procedurally unconscionable. This alone is sufficient grounds to render the agreement unenforceable. *Burnett*, 470 P.3d at 494 (denying motion to compel arbitration where plaintiff was not on notice of the terms and thus lacked a meaningful choice in agreeing to arbitrate).

**b. Substantive Unconscionability**

Substantive unconscionability exists where terms are "overly harsh" or "one-sided." *Armendariz*, 24 Cal. 4th at 114; *Zuver v. Airtouch Commc's, Inc.*, 153 Wash. 2d 293, 303 (2004); *Pokorny v. Quixtar*, 601 F.3d 987, 997–98 (9th Cir. 2010) ("[M]utuality is the 'paramount' consideration when assessing substantive unconscionability."); *see Szetela v. Discover Bank*, 97 Cal. App. 4th 1094, 1101 (2002) (finding a mutual prohibition on representative or class actions



SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

substantively unconscionable because credit card companies seldom sue their customers in class action lawsuits, and thus this provision was clearly meant to prevent customers from seeking redress for relatively small amounts of money).

First, as described below, the arbitration provision's ban on public injunctive relief violates California law rendering it substantively unconscionable. *See MacClelland v. Cellco P'ship*, 609 F. Supp.3d 1024, 1037 (N.D. Cal. 2022) ("California courts have found substantive unconscionability where an arbitration clause limits the types of remedies that would be available under the statute.")

Second, under the MSA, Microsoft can modify the *substantive* terms and retroactively apply them; this is inherently one-sided and does not allow the parties equitable bargaining power. *Armendariz*, 24 Cal. 4th at 114. Microsoft also surreptitiously changes privacy statements, without any notice to or consent from consumers. Recently, Microsoft again changed its privacy statement in an attempt to somehow extend the scope of the MSA and also grant itself additional rights to user data. But user data does not belong to Microsoft, even if Microsoft might state so in the fine print of its ever-changing statements.

Third, Microsoft's limitation of liability and damages within its MSA significantly undermines the legal recourse available to users for any harm suffered, potentially leaving them without adequate remedy for their losses and disproportionately favoring Microsoft—a 3.3-***trillion***-dollar company. *Newton v. Am. Debt Servs., Inc.*, 854 F. Supp. 2d 712, 725 (N.D. Cal. 2012) ("Because the limitation of liability clause prevents customers from receiving damages that they are entitled to under CROA, this term is substantively unconscionable."); *Armendariz,* 24 Cal. 4th at 103–104 (an arbitration agreement limiting statutorily available remedies such as punitive damages and attorney's fees is "contrary to public policy and unlawful"); *Graham Oil Co. v. ARCO Prods. Co*., 43 F.3d 1244, 1248 (9th Cir. 1995) (similar); *cf. Hovis v. Homeaglow, Inc.*, 2023 WL 5003583, *4 (S.D. Cal. 2023).



SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

### F. Notwithstanding any Other Argument, Plaintiffs' Claims for Public Injunctive Relief Cannot be Forced into Arbitration

The MSA states that "requests for public injunctions . . . . aren't allowed." Fogarty Decl. Ex. A at 26. It subsequently reiterates that the arbitrator "may award declaratory or injunctive relief **only to you individually** to satisfy your individual claim, but not relief that would affect non-parties." *Id.* (similar provision exists in the prior versions of the MSA, *see* Fogarty Decl. Ex. B at 9, 24, 102, 131, 160, 220). However, in California, any pre-dispute arbitration provision that waives a plaintiff's statutory right to seek public injunctive relief, in any forum, violates public policy and is therefore unenforceable. *See McGill*, 2 Cal. 5th at 952 (holding any contract that bars public injunctive relief in both court and arbitration violates Cal. Civ. Code, § 3513, which provides that "a law established for a public reason cannot be contravened by a private agreement."). Here, Plaintiffs seek public injunctive relief under counts 1-5, and 8: (1) federal and California wiretapping claims (18 U.S.C. § 2510 *et seq.* and Cal. Pen. Code § 631 *et. seq.*); (2) CFAA (18 U.S.C. § 1030); (3) California privacy claims; and (4) UCL, Bus. & Prof. Code § 17200 *et seq*. *See* Compl., ¶¶222, 230, 242, 245, 270, 283, 305. The MSA's prohibition of public injunctive relief in any forum is unenforceable. *See e.g.*, *Blair v. Rent-A- Ctr., Inc*., 928 F.3d 819, 824 (9th Circ. 2019) (finding that it was sufficient for the plaintiffs to seek a "public injunction" under, among other statutes, the UCL); *Vaughn v. Tesla, Inc*., 87 Cal. App. 5th 208, 231 (2023) (Defendant articulates no persuasive reason why injunctions sought under the false advertising law, the UCL, and the CLRA may be viewed as primarily benefitting the public but an injunction sought under FEHA may not); *Vianu v. AT&T Mobility LLC*, 2020 WL 12862941, at *3-*4 (N.D. Cal. Mar. 2, 2020) (denying motion to compel arbitration where plaintiffs sought public-injunctive relief for deceptive practices aimed at the public).

## IV. CONCLUSION

For the foregoing reasons, the Court should deny Microsoft's Motion to Compel Arbitration and Stay Case.



SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

DATED this 12th day of July, 2024.

SUMMIT LAW GROUP, PLLC

I CERTIFY THAT THIS MEMORANDUM CONTAINS 10,793 WORDS IN COMPLIANCE WITH THE LOCAL CIVIL RULES.

By *s/ Alexander A. Baehr*
Alexander A. Baehr, WSBA No. 25320
Molly J. Gibbons WSBA No. 58357
Rebecca R. Singleton WSBA No. 57719
315 Fifth Avenue S., Suite 1000
Seattle, WA 98104
Telephone: (206) 676-7000
Email: alexb@summitlaw.com
mollyg@summitlaw.com
rebeccas@summitlaw.com

BIRD, MARELLA, BOXER, WOLPERT, NESSIM, DROOKS, LINCENBERG & RHOW, PC
Ekwan E. Rhow *(pro hac vice forthcoming)*
Marc E. Masters *(pro hac vice forthcoming)*
Barr Benyamin *(pro hac vice forthcoming)*
1875 Century Park East, 23rd Floor
Los Angeles, CA 90067
Telephone: (310) 201-2100
Email: erhow@birdmarella.com
mmasters@birdmarella.com
bbenyamin@birdmarella.com

GLANCY PRONGAY & MURRAY LLP
Jonathan Rotter *(pro hac vice forthcoming)*
Raymond D. Sulentic *(pro hac vice forthcoming)*
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: jrotter@glancylaw.com
rsulentic@glancylaw.com

CLARKSON LAW FIRM, P.C.
Glenn A. Danas *(pro hac vice forthcoming)*
Yana Hart *(pro hac vice forthcoming)*
Katelyn M. Leeviraphan *(pro hac vice forthcoming)*
22525 Pacific Coast Highway
Malibu, CA 90265
Tel: (213) 788-4050
Fax: (213) 788-4070
Email: gdanas@clarksonlawfirm.com
yhart@clarksonlawfirm.com
kleeviraphan@clarksonlawfirm.com

**Attorneys for Plaintiffs and the Putative Classes and Subclasses**