1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

NOAH SAEEDY, et al.,

                     Plaintiffs,

          v.

MICROSOFT CORPORATION,

                     Defendant.

Case No. C24-0219-SKV

ORDER RE:  MOTION TO COMPEL
ARBITRATION AND STAY CASE

INTRODUCTION

Plaintiffs Noah Saeedy, Vishal Shah, Tina Wilkinson, and minor M.C. bring federal and state law causes of action, on behalf of themselves and all similarly situated individuals, against Defendant Microsoft Corporation (hereinafter "Microsoft"), and associated with Plaintiffs' use of Microsoft's Edge internet browser.  Dkt. 1-1.  Now pending before the Court is Microsoft's Motion to Compel Arbitration and Stay Case.  Dkts. 6 & 56-1.  Plaintiffs oppose the motion. Dkt. 47.  The Court held oral argument and directed the filing of supplemental briefing.  *See* Dkts. 58-59, 61-66.  Now, having considered the motion, all materials filed in support and in

opposition, the oral argument, and the remainder of the record, the Court herein GRANTS in part and DENIES in part Microsoft's Motion to Compel Arbitration and Stay Case.

BACKGROUND

Plaintiffs allege Microsoft programmed its Edge internet browser to surreptitiously intercept, collect, and send to Microsoft private data relating to users' internet browsing activities, internet searches, and online shopping behavior, including while in "private" browsing mode. Dkt. 1-1, ¶2. They allege Microsoft links or binds the private data to individual users such that they are personally identifiable, does so without users' actual or implied consent, and "fails to conspicuously present its flawed and deficient Privacy Statement and Terms of Use to users and thus these electronic documents have no legal effect." *Id.*, ¶¶2-5. They sue on behalf of a nationwide class and subclasses, and raise thirteen causes of action alleging violations of federal and state law. *See* Dkt. 1-1.

Plaintiffs originally raised their allegations in a lawsuit filed in this Court in July 2023. *See Saeedy v. Microsoft Corp.*, C23-1104-BJR (the "Original Federal Case"). In January 2024, the Court found an absence of standing, dismissed the claims, and granted leave to amend. *Id.*, Dkt. 44. The Court found Plaintiffs lacked standing to pursue "privacy-related" claims because they had not alleged a sufficiently concrete privacy injury to provide a basis for standing, and lacked standing to pursue "property-related" claims because they failed to show they personally lost money or property as a result of Microsoft's conduct. *Saeedy v. Microsoft Corp.*, C23-1104-BJR, 2023 WL 8828852, at *4-7 (W.D. Wash. Dec. 21, 2023). With respect to the privacy-related claims, the Court found Plaintiffs had no "recognized reasonable expectation of privacy in their browsing data." *Id.* at *4. Plaintiffs had not alleged they provided any personal or sensitive information that implicated a protectable privacy interest. *Id.* Also, while Plaintiffs

alleged the collected data could be associated with user names when the user was logged in to a Microsoft account, none of the Plaintiffs alleged they logged in to a Microsoft account either before or during their browsing activities.  *Id*. at \*5 & n. 6.  Nor had Plaintiffs alleged their data "was either disclosed or sold to a third party, or that Microsoft broke its privacy promises."  *Id*. at \*5.

In lieu of moving to amend, Plaintiffs voluntarily dismissed their claims and, on January 25, 2024, filed a revised pleading in King County Superior Court.  *See* Dkt. 1-1; Original Federal Case, Dkt. 45.  As set forth in the revised pleading, Plaintiffs Saeedy, Shah and Wilkinson have used Microsoft Edge since at least June 2021, while Plaintiff M.C. has used Edge since at least 2020.  Dkt. 1-1, ¶¶7, 11, 15, 20; *see also* Dkt. 50, ¶19; Dkt. 51, ¶16; Dkt. 52, ¶19; and Dkt. 57-1, ¶¶11-12.  They used Edge on personal, work, and/or school-provided computers, all of which ran on Microsoft's Windows operating system and came with Edge pre-installed as the default internet browsing software.  Dkt. 50, ¶19; Dkt. 51, ¶16; Dkt. 52, ¶¶19-20; Dkt. 57-1, ¶¶12-13.  Plaintiffs allege they were frequently, or in M.C.'s case "almost always", logged in to their Microsoft accounts when using Edge, and that Saeedy, Shah, and Wilkinson used Microsoft Bing, along with other search engines, while using the Edge Browser.  Dkt. 1-1, ¶¶9, 13, 18, 23.  *But see* Dkt. 57-1 (declaration denying M.C. ever created a Microsoft account).

Microsoft removed the matter to this Court on February 16, 2024, Dkt. 1, and, on February 23, 2024, Microsoft moved to compel arbitration and Plaintiffs moved to remand the matter back to state court, Dkts. 6 & 10.  The Court struck the noting date for the arbitration motion pending a determination on the motion to remand.  Dkt. 32.  The Court subsequently granted the motion to remand only in relation to Plaintiffs' property-related claims.  Dkt. 42.  In finding standing in relation to the privacy-related claims, the Court noted that Plaintiffs corrected

1   the deficiencies previously identified by now alleging "(1) they were logged in to their Microsoft

2   accounts, (2) while using Edge to access specific types of private financial, medical, and other

3   information, (3) and experienced targeted advertising based on those activities and searches,

4   even when operating in 'private' mode." *Id*. at 15.

5          The Court now addresses the motion to compel arbitration. *See* Dkts. 6 & 56-1. As

6   discussed herein, Microsoft bases its motion on the arbitration provision contained in the

7   "Microsoft Services Agreement" (MSA) and Plaintiffs' creation of Microsoft accounts.

8   Specifically, Microsoft contends Saeedy, Shah, and Wilkinson should be compelled to arbitrate

9   because they agreed to the MSA when they created their Microsoft accounts, and when they

10  continued to use their accounts following notification of MSA updates. Microsoft also contends

11  that, while the question of whether M.C. created or used a Microsoft account has not yet been

12  resolved, M.C. should likewise be compelled to arbitrate.

13                                    <u>DISCUSSION</u>

14         Microsoft seeks to compel arbitration pursuant to the Federal Arbitration Act (FAA).

15  Under Section 2 of the FAA, written agreements to arbitrate disputes arising out of transactions

16  involving commerce "shall be valid, irrevocable, and enforceable, save upon such grounds as

17  exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. This provision reflects

18  "both a liberal federal policy favoring arbitration, and the fundamental principle that arbitration

19  is a matter of contract." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (cleaned

20  up).

21         On a motion to compel arbitration, the Court is tasked with addressing "two gateway

22  arbitrability issues: '(1) whether a valid agreement to arbitrate exists, and if it does, (2) whether

23  the agreement encompasses the dispute at issue.'" *Bielski v. Coinbase, Inc.*, 87 F.4th 1003, 1009

ORDER RE: MOTION TO COMPEL
ARBITRATION AND STAY CASE - 4

(9th Cir. 2023) (quoting *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000)). The Court also considers challenges to the enforceability of an arbitration agreement. *See id.* ("Because an arbitration agreement is a contract like any other, it may 'be invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability.'") (quoting *Lim v. TForce Logistics, LLC*, 8 F.4th 992, 999 (9th Cir. 2021)). However, on finding a valid, enforceable agreement to arbitrate encompassing the parties' dispute, "the court must order the parties to proceed to arbitration in accordance with the terms of the agreement." *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 510 (9th Cir. 2023) (citing 9 U.S.C. § 4).

Microsoft here argues that, in creating and continuing to use their Microsoft accounts, Saeedy, Shah, and Wilkinson are bound to the binding arbitration clause contained in the MSA, which encompasses the dispute at issue. Plaintiffs argue that Microsoft waived any right to arbitration, and raise a preliminary dispute as to the governing terms. Plaintiffs further deny that an agreement to arbitrate under the MSA exists or governs the subject of their lawsuit, and argue that, even if the MSA governs, Microsoft cannot compel arbitration of their claims. The parties also dispute whether Microsoft may compel M.C. to arbitrate. The Court addresses these arguments below.

A.    Waiver of Right to Compel Arbitration

"The right to arbitration, like other contractual rights, can be waived." *Martin v. Yasuda*, 829 F.3d 1118, 1124 (9th Cir. 2016) (citation omitted). Waiver "'is the intentional relinquishment or abandonment of a known right.'" *Morgan v. Sundance, Inc.*, 596 U.S. 411, 417 (2022) (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993)). "[T]he test for waiver of the right to compel arbitration consists of two elements: (1) knowledge of an existing right to

1   compel arbitration; and (2) intentional acts inconsistent with that existing right." *Hill v. Xerox*

2   *Bus. Servs.*, LLC, 59 F.4th 457, 468 (9th Cir. 2023). *See also Morgan*, 596 U.S. at 416-18

3   (eliminating a previous requirement to show prejudice); and *Armstrong v. Michaels Stores, Inc.*,

4   59 F.4th 1011 (9th Cir. 2023) ("[C]ontractual waiver generally requires 'an existing right, a

5   knowledge of its existence, and an actual intention to relinquish it, or conduct so inconsistent

6   with the intent to enforce the right as to induce a reasonable belief that it has been relinquished,

7   with no required showing of prejudice.") (quoted sources omitted).

8       The Court considers the totality of the parties' actions in determining whether a party has

9   engaged in acts inconsistent with a right to arbitrate. *Hill*, 59 F.4th at 471. The Court asks

10  "whether those actions holistically indicate a conscious decision to seek judicial judgment on the

11  merits of the arbitrable claims, which would be inconsistent with a right to arbitrate." *Armstrong*,

12  59 F.4th at 1015 (cleaned up and quoted sources omitted). "[A] party generally 'acts

13  inconsistently with exercising the right to arbitrate when it (1) makes an intentional decision not

14  to move to compel arbitration and (2) actively litigates the merits of a case for a prolonged

15  period of time in order to take advantage of being in court.'" *Id*. (quoting *Newirth v. Aegis*

16  *Senior Cmtys., LLC*, 931 F.3d 935, 941 (9th Cir. 2019)).

17      Plaintiffs argue Microsoft waived its right to compel arbitration by litigating in court,

18  filing motions, engaging in discovery, seeking removal, and only attempting to compel

19  arbitration as a last resort. That is, rather than seeking to compel arbitration in the eight months

20  between the July 2023 filing of the Original Federal Case and the February 2024 filing of the

21  motion to compel arbitration, Microsoft moved for dismissal, litigated through the exchange of

22  initial disclosures, meet-and-confer efforts, negotiation of a joint discovery plan and joint

23  protective order, and initial negotiation of an ESI agreement, and removed the current matter

1   from state court.  Plaintiffs also assert that, as of August 30, 2023, Microsoft had the email

2   addresses and user IDs that Saeedy, Shah, and Wilkinson used to create their Microsoft accounts,

3   allowing Microsoft to assess its ability to compel arbitration.  *See* Dkt. 48, ¶2.  The Court, for the

4   reasons discussed below, is not persuaded by these arguments.

5           Plaintiffs suggest that Microsoft knew of an existing right to compel arbitration at the

6   outset of the Original Federal Case.  However, throughout those earlier proceedings, Microsoft

7   denied it possessed the information necessary to determine its right to arbitrate.  *See* Original

8   Federal Case, Dkt. 36 at 6, n.3 (motion to dismiss stating Plaintiffs' counsel refused to provide

9   necessary information) and Dkt. 42 at 4 (joint status report stating Microsoft requested necessary

10  information, including usernames, device IDs, and domain information for any work-provisioned

11  computer used to access Edge).  *See also* Dkt. 8, Exs. B & C (August 2023 and January 2024

12  emails indicating continued need for requested information to evaluate right to arbitrate).

13          The fact that Plaintiffs provided email addresses and user IDs for Saeedy, Wilkinson, and

14  Shah in August 2023, Dkt. 8, Ex. B at 1, does not demonstrate Microsoft possessed the

15  information it needed to compel arbitration at that time.  In moving to dismiss the Original

16  Federal Case, Microsoft argued that, pursuant to Plaintiffs' own allegations, Microsoft could

17  only associate Edge browsing data with an identifiable person when that person was logged in to

18  a Microsoft account, and none of the Plaintiffs alleged they were logged in to their Microsoft

19  accounts while using Edge.  Original Federal Case, Dkt. 36 at 5-6, 10.  Microsoft now argues

20  that Plaintiffs agreed to the MSA and its arbitration clause in creating and continuing to use their

21  Microsoft accounts and that the MSA encompasses the parties' dispute, which only now includes

22  allegations that Plaintiffs were logged in to their Microsoft accounts while using Edge.  *See* Dkt.

23  1-1, ¶¶9, 13, 18, 23; Dkts. 6 & 56-1.  In other words, while Microsoft may have previously

1    possessed information allowing for a determination of whether and when three of the Plaintiffs

2    created Microsoft accounts, they did not possess the information supporting their theory of a

3    binding agreement to arbitrate until Plaintiffs filed their new and revised Complaint.[1]

4          Plaintiffs also fail to show Microsoft acted inconsistently with an existing right to

5    arbitrate.  Rather than evincing a conscious decision to seek a judgment on the merits of

6    arbitrable claims, Microsoft was "consistently vocal about its intent to move to compel

7    arbitration." *Armstrong*, 59 F.4th at 1015.  Specifically, while litigating the Original Federal

8    Case, Microsoft repeatedly clarified it was not waiving its right to arbitrate and reserved its right

9    to compel arbitration should discovery reveal the existence of an agreement to arbitrate. *See,*

10   *e.g.,* Original Federal Case, Dkt. 36 at 6, n.3; Dkt. 42 at 4. *See also* Dkt. 8, Ex. B.  Nor, upon

11   reaching the conclusion that an agreement to arbitrate existed, did Microsoft actively litigate the

12   merits of the case for a prolonged period.  Instead, within a month of the filing of the revised

13   complaint, Microsoft both removed the action and moved to compel arbitration. *See* Dkts. 1 & 6.

14   As Microsoft observes, the cases Plaintiffs cite as finding waiver are inapposite. *See, e.g.,*

15   *Newirth*, 931 F.3d at 942 (defendants "intentionally withdrew" arbitration motion and took

16   advantage of federal forum by filing a motion to dismiss, and only refiled arbitration motion after

17   receiving an adverse ruling); *Martin*, 829 F.3d at 1120-22, 1126 (before pursuing arbitration,

18   defendants spent seventeen months litigating, including filing a motion to dismiss and engaging

19   in discovery, explained they were likely "'better off'" in federal court, and were warned by the

20   judge "about the possibility of waiver."); *Kelly v. Pub. Util. Dist. No. 2 of Grant Cnty.*, 552 F.

21   App'x 663, 664 (9th Cir. 2014) (while they could have compelled arbitration at the outset,

22    

23        [1] Microsoft also asserts it requested but did not receive other relevant information, such as any
license terms attached to Plaintiffs' devices. *See* Dkt. 56-1 at 11, n.7; Dkt. 8, Exs. B & C; and Dkt. 53 at
10. *See also* Original Federal Case, Dkt. 36 at 6, n.3 & Dkt. 42 at 4.

ORDER RE:  MOTION TO COMPEL
ARBITRATION AND STAY CASE - 8

1   defendants waited eleven months, during which they actively litigated by conducting discovery

2   and litigating motions for a preliminary injunction and to dismiss); *Van Ness Townhouses v. Mar*

3   *Indus. Corp.*, 862 F.2d 754, 759 (9th Cir. 1988) (defendant "chose . . . to litigate actively the

4   entire matter . . . and did not move to compel arbitration until more than two years after the

5   appellants brought the action."); *FBC Mortg., LLC v. Skarg*, 699 F. Supp. 3d 837, 842-43 (N.D.

6   Cal. 2023) (defendants were aware of applicable arbitration clauses, but "waited eight months

7   and affirmatively 'engaged in other litigation procedure' to try to dismiss two . . . claims on the

8   merits.")

9          Finally, the mere fact removal came before the arbitration motion does not support a

10   finding of waiver.  Courts have, in fact, "consistently rejected the argument that a party waived

11   the right to compel arbitration by removing a case to federal court."  *Armstrong v. Michaels*

12   *Stores, Inc.*, C17-6540, 2018 WL 6505997, at *10 (N.D. Cal. Dec. 11, 2018) (case citations

13   omitted), *aff'd*, 59 F.4th 1011 (9th Cir. 2023).  *See also Burgess v. Buddy's Nw. LLC*, No. C15-

14   5785-BHS, 2016 WL 7387099, at *4 (W.D. Wash. Dec. 21, 2016) (noting the "substantial

15   authority" suggesting exercise of the right to removal and the filing of "an answer with

16   counterclaims (without litigating them) is not sufficiently inconsistent'" with the right to

17   arbitrate) (citations omitted).  The Court, for this reason and for the reasons stated above,

18   concludes Microsoft did not waive its right to arbitrate.

19   B.    Governing Terms

20          Plaintiffs next point to Ninth Circuit case law providing that, where parties disagree as to

21   which of two agreements govern a dispute, the Court must determine whether the agreements

22   "are separate, each subject to individual interpretation," or "merely interrelated contracts in an

23   ongoing series of transactions[.]"  *Int'l Ambassador Programs, Inc. v. Archexpo*, 68 F.3d 337,

339-40 (9th Cir. 1995).  "Where two contracts are 'separate,' the lack of an arbitration clause means disputes over the agreement are not subject to arbitration.  But where two contracts are merely interrelated contracts in an ongoing series of transactions, an arbitration provision in one contract could apply to subsequent contracts.'"  *Johnson v. Walmart Inc.*, 57 F.4th 677, 682-83 (9th Cir. 2023) (cleaned up and quoting *Int'l Ambassador Programs, Inc.*, 68 F.3d at 340).

Plaintiffs argue the Edge end-user licensing terms (EULA), not the MSA, govern their use of Edge.  *See* Dkt. 48, Ex. B (copy of EULA, or "Microsoft Software License Terms", captured on April 5, 2024) & Ex. C (copy captured on July 10, 2024).  They assert that the MSA and EULA are wholly separate agreements that govern different Microsoft products, with no overlap and without one agreement incorporating the other.

Plaintiffs do not, however, contend they are bound by the EULA.  In fact, Plaintiffs deny they agreed to the EULA, observing that Edge came preinstalled on their devices, that they simply began using it as their default browser, and that they were never presented with or required to consent to any terms of use.  They also argue that, even if they had agreed, the EULA does not contain an arbitration clause that applies to them as Windows users.  Dkt. 48, Exs. B & C (including arbitration clause only for non-Windows users).  Plaintiffs, in sum, argue that a contract they did not agree to, the EULA, is separate and independent from the MSA, another contract to which they did not agree.  Microsoft, while arguing the existence of an agreement under the MSA, asserts that it lacks the information needed to address whether Plaintiffs agreed to the Edge EULA, or to the Windows EULA discussed therein.  *See* Dkt. 53 at 12 (citing Dkt. 8, Ex. C).

Without more information, the Court is similarly unable to determine whether there is an agreement between Plaintiffs and Microsoft under the Edge EULA.  Accordingly, unlike the

1    cases cited by Plaintiffs, the Court need not determine which of two binding agreements governs

2    the parties' dispute.  *See Johnson*, 57 F.4th at 682-83 (finding two agreements separate where the

3    second was negotiated and entered into separate from the first, they involved separate

4    consideration, and the proof required to establish the claim depended exclusively on the second

5    agreement); *Int'l Ambassador Programs, Inc.*, 68 F.3d at 339-40 (finding two agreements

6    separate where they concerned "two separate types of tours and completely different groups of

7    tourists[,]" and the absence of an arbitration clause in the later agreement indicated an "intent to

8    treat it differently than the [earlier] agreement.")  Having found as such, the Court proceeds to

9    consider the existence of an agreement to arbitrate under the MSA.

10   C.    <u>Existence of Agreement to Arbitrate</u>

11         The party seeking to compel arbitration "bears 'the burden of proving the existence of an

12   agreement to arbitrate by a preponderance of the evidence.'"  *Norcia v. Samsung Telecomm.*

13   *Am.*, 845 F.3d 1279, 1283 (9th Cir. 2017) (quoting *Knutson v. Sirius XM Radio Inc.*, 771 F.3d

14   559, 565 (9th Cir. 2014)).  This burden is substantial and the Court must give the party denying

15   the existence of an agreement "'the benefit of all reasonable doubts and inferences that may

16   arise.'"  *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 1141 (9th Cir.

17   1991) (quoted source omitted).  *Accord Peters v. Amazon Services LLC*, 2 F. Supp. 3d 1165,

18   1169-70 (W.D. Wash. 2013).  *See also Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 742

19   (9th Cir. 2014) (a "presumption in favor of arbitrability" applies only where the *scope* of an

20   agreement to arbitrate is ambiguous:  "If the parties contest the *existence* of an arbitration

21   agreement, the presumption in favor of arbitrability does not apply.")

22         In determining whether an agreement to arbitrate exists, the Court applies ordinary state-

23   law principles governing the formation of contracts.  *First Options of Chicago, Inc. v. Kaplan*,

ORDER RE:  MOTION TO COMPEL
ARBITRATION AND STAY CASE - 11

514 U.S. 938, 944 (1995); *Norcia*, 845 F.3d at 1283.  In this case, the parties agree that the laws

of Washington and California, the states where Plaintiffs reside, govern this dispute.[2]  They also

agree that the laws are substantially similar.  That is, to form a contract under either Washington

or California law, "there must be actual or constructive notice of the agreement and the parties

must manifest mutual assent."  *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 855-56

(9th Cir. 2022) (California law); *accord Wilson v. Huuuge, Inc.*, 944 F.3d 1212, 1219-21 (9th

Cir. 2019) (Washington law).

The same basic contractual principles apply to agreements formed online.  *Id*.  With an

online agreement, a determination of mutual assent often turns on whether a consumer had

reasonable notice of the terms.  *Id*.  Notice may be found through actual knowledge or through

"inquiry notice," such that a reasonable person would be on notice of the agreement and its

contents.  *See Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 232 (2d Cir. 2016) (Washington law);

*Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014) (California law).

Online agreements take many forms, including "'browsewraps, clickwraps, scrollwraps,

and sign-in wraps.'"  *Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1014 (9th Cir. 2024)

(quoting *Sellers v. JustAnswer LLC*, 73 Cal.App.5th 444, 289 Cal. Rptr. 3d 1, 15 (2021), and

applying California law).  "Browsewrap" agreements, in which a website offers terms through a

hyperlink and a user is said to assent simply by using the website, are routinely found

unenforceable because they fail to provide sufficient notice.  *Id*.  "Scrollwrap" agreements, in

which a user must scroll through the terms of an agreement before clicking a mandatory "I

agree" box, provide the strongest notice.  *Id*.  Courts also routinely find enforceable "clickwrap"

or "click-through" agreements, wherein "'a website presents users with specified contractual

---

[2] Plaintiffs do not agree with Microsoft's contention that California and Washington law govern because of the MSA's choice of law provision.  *See* Dkt. 56-1 at 16, n.10 & Dkt. 47 at 12, n.10.

1    terms on a pop-up screen and users must check a box explicitly stating "I agree" in order to

2    proceed.'"  *Oberstein*, 60 F.4th at 513 (quoting *Berman*, 30 F.4th at 856).

3        This case, as reflected in the discussion below, involves a "sign-in wrap" agreement.

4    Sign-in wrap agreements fall somewhere between a clickwrap and a browsewrap, "include a

5    textual notice that a user will be bound by the terms of use either by creating or logging in to an

6    account or by placing an order[,]" but do not require a user "to review the terms and conditions

7    or otherwise manifest their assent."  *Cavanaugh v. Fanatics, LLC*, C22-1085, 2024 WL

8    3202567, at *4 (E.D. Cal. June 26, 2024).  *Accord Keebaugh*, 100 F.4th at 1014 (sign-in wrap

9    agreement required a user "to advance through a sign-in screen which states 'By tapping "Play,"

10    I agree to the Terms of Service.'"); *Marshall v. Hipcamp Inc.*, C23-6156-TLF, ___ F. Supp. 3d

11    ___, 2024 WL 2325197, at *5 (W.D. Wash. May 22, 2024) (sign-in wrap agreement stated, "'By

12    signing up, I agree to Hipcamp's terms and privacy policy'", below buttons allowing sign-up

13    through Apple, Facebook, or an email address).  "With this type of agreement, the user is

14    'largely passive' and whether a contract exists turns on 'whether a reasonable prudent offeree

15    would be on inquiry notice of the terms at issue.'  *Cavanaugh,* 2024 WL 3202567, at *4.

16        The assessment of sign-in wrap and other types of online agreements entails a fact-

17    intensive inquiry.  *See Oberstein*, 60 F.4th at 513-15.  Unless actual knowledge of an agreement

18    can be shown, an enforceable agreement may be found only if "'(1) the website provides

19    reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the

20    consumer takes some action, such as clicking a button or checking a box, that unambiguously

21    manifests his or her assent to those terms.'"  *Id.* at 515 (quoting *Berman*, 30 F.4th at 856, and

22    applying California law).  *Accord Grant v. T-Mobile USA, Inc.*, C23-1946-MJP, 2024 WL

23    3510937, at *4-5 (W.D. Wash. July 23, 2024) (applying same standard to contract governed by

1    Washington law).  Also, "in determining whether the terms and conditions of a website were

2    conspicuous enough that a consumer is bound to a website's terms – i.e., whether a contract was

3    formed – courts must consider both the 'context of the transaction' and the 'the visual aspects of

4    the notice.'" *Fed. Trade Comm'n v. Amazon.com, Inc.*, C23-0932-JHC, __ F. Supp. 3d __, 2024

5    WL 2723812, at *8 (W.D. Wash. May 28, 2024) (quoting *Keebaugh*, 100 F.4th at 1019).

6         In this case, Microsoft contends Saeedy, Shah, and Wilkinson agreed to the terms of the

7    MSA and its binding arbitration clause when they created their Microsoft accounts.  As

8    described by Microsoft, a Microsoft account is a free personal account consumers can use to

9    access and manage experiences across a range of Microsoft devices, products, and services.  Dkt.

10   56-2, ¶2.  It is distinct from business services Microsoft provides for a workplace or school.  *Id.*

11        Microsoft provides both the current MSA, updated effective September 30, 2023, Dkt. 7,

12   Ex. A, and preceding versions in effect between October 2012 and September 29, 2023, *id.*, Ex.

13   B.  A notice at the top of the MSA states that it contains a "**BINDING ARBITRATION**

14   **CLAUSE AND CLASS ACTION WAIVER**" that "**AFFECTS YOUR RIGHTS ABOUT**

15   **HOW TO RESOLVE ANY DISPUTE WITH MICROSOFT**", or that "**AFFECTS HOW**

16   **DISPUTES ARE RESOLVED**[,]" and directs review of the specific arbitration/class action

17   waiver provisions.  Dkt. 7-2 at 1, 16, 55.  *See also* Dkt. 7-1 at 2; Dkt. 7-2 at 198.  The MSAs

18   identify "Covered Services," which include Microsoft accounts and Bing, Dkt. 7-2 at 2, 8, 16,

19   23-24, 72, 77-79, 220, 226-29; *see also* Dkt. 7-1 at 25-26, 32-35, and discuss Microsoft's

20   "privacy statement", which describes how Microsoft uses an individual's data and content, *see*

21   Dkt. 7-1 at 2  (2023 MSA stating that, where processing of data and content "is based on consent

22   and to the extent permitted by law, by agreeing to these Terms, you consent to Microsoft's

23

1    collection, use and disclosure of [that content and data] as described in the Privacy

2    Statement[.]"); *see also* Dkt. 7-2 at 5, 17-20, 55, and 198.

3         Microsoft also provides a declaration from Microsoft Senior Product Manager Suzanne

4    Fogarty outlining an example of the account creation process.  Dkt. 56-2; *see also* Dkt. 56 at 1

5    (clarifying this is an example, as opposed to the only possible account-creation process).  In this

6    example, a consumer is prompted to "Create a Password" and activate a "Next" button, with a

7    notice directly above that button stating, "Choosing **Next** means that you agree to the Microsoft

8    Services Agreement and privacy and cookies statement[,]" with MSA and privacy statement

9    appearing in blue, hyperlinked text:

10
11
12
13
14
15
16
17



18   Dkt. 56-2, ¶3-4.  Fogarty attests that a prospective user cannot create, access, or use a Microsoft

19   account unless and until they affirmatively accept the MSA by clicking the button on the screen.

20   *Id*., ¶4.  Fogarty also attests that, except for the fact the "Next" button was previously labeled "I

21   Agree", the account creation process has been materially the same since October 2012, and that,

22   in any possible scenario and in all instances, a prospective user would have been presented with

23   the hyperlinked MSA and notice that clicking on the button constituted agreement.  *Id*., ¶¶4-5.

Microsoft additionally submits evidence specific to the Microsoft accounts created by Plaintiffs. The evidence, based on records created and kept in the ordinary course of Microsoft's business and consistent with Plaintiffs' declarations, shows that Wilkinson, Saeedy, and Shah created their Microsoft accounts on, respectively, December 26, 2013, April 13, 2015, and November 9, 2016, Dkts. 50-52 & 56-2, ¶8, and that the MSAs in effect on those dates contained the above-described arbitration clause, Dkt. 7-2 at 2, 8-10 (MSA in effect as of October 19, 2012), 15, 23-25 (MSA in effect as of July 31, 2014), and 55, 72-73 (MSA in effect as of September 15, 2016).

The evidence also includes, at the request of the Court, visual examples of the account creation process at times in close proximity to when Wilkinson, Saeedy, and Shah created their accounts, and in the form of images captured through the Internet Archive's Wayback Machine website. Dkt. 63, ¶¶2-4 (citing https://web.archive.org/web/20131205150512/https://signup. live.com/signup.aspx?lic=1; https://web.archive.org/web/20150330064154/https://signup.live. com/signup?uaid=616353e0e4ef4785a3600c0a5f45ba76&lic=1; and https://web.archive.org/ web/20161106003758/https://signup.live.com/signup.aspx?lic=1&uaid=34f04d14c7dd43729 3499cdb6fa31eae (last viewed by the Court on November 21, 2024) and Exs. A-C (screenshot printouts). Examples dated December 5, 2013 and March 30, 2015 show an account creation process in which users are advised, respectively, to "Click **I accept** to agree to the Microsoft services agreement and privacy & cookies statement" above a blue "I accept" button, and to "Click **Create account** to agree to the Microsoft Services Agreement and privacy and cookies statement" above a blue "Create account" button. *Id.* As with the example originally provided, MSA and privacy statement appear in blue, hyperlinked text. Dkt. 63, ¶¶2-3, Exs. A-B. A third example, dated November 6, 2016, captures only the initial page of the account-creation process,

1    without the MSA or privacy statement notice.  *Id.*, ¶4 & Ex. C.  Microsoft identifies links to

2    three YouTube videos, dated in April 2015, April 2016, and November 2016, and showing an

3    account creation process in which a user is advised that clicking on a blue "Create account"

4    button means that you agree to the MSA and privacy statement, with both MSA and privacy

5    statement appearing in blue, hyperlinked text, immediately above the create account button.  *Id.*,

6    ¶4 (citing:  https://www.youtube.com/watch?v=GzlQV15N7ZA (dated April 2016);

7    https://www.youtube.com/watch?v=x3QLmy5lY50 (dated April 2015); https://www.youtube.

8    com/watch?v=vk0qs-C-bMc (dated November 2016) (last viewed by the Court on November 21,

9    2024)).

10            Microsoft argues Saeedy, Shah, and Wilkinson agreed to binding individual arbitration

11    when they created their Microsoft accounts because the sign-in wrap agreements then in place

12    provided reasonably conspicuous notice of the terms to which they would be bound, and they

13    manifested their assent to those terms by clicking on a button directly below the notice, as was

14    necessary to create their Microsoft accounts.  Plaintiffs challenge the sufficiency of the evidence

15    offered by Microsoft, and argue Microsoft fails to show either notice of or assent to the MSA.

16    The Court addresses these arguments in turn.

17            1.    Sufficiency of Evidence

18            In challenging the sufficiency of the evidence in their opposition brief, Plaintiffs pointed

19    to Microsoft's reliance on an undated screenshot and a declaration from Plaintiffs' counsel

20    describing an account creation process that differed from the process described by Fogarty.  *See*

21    Dkts. 47-48.  Plaintiffs' counsel specifically attested that, in a recent attempt to open a Microsoft

22    account, the MSA and privacy statement disclosures appeared on a screen asking for verification

23    of an email address, not on the preceding "Create a password" screen depicted in the Fogarty

ORDER RE:  MOTION TO COMPEL
ARBITRATION AND STAY CASE - 17

declaration.  Dkt. 48, ¶¶3-11.  Counsel also suggested that, in the process as described by

Fogarty, the disclosures could be blocked by a box containing a generated password suggestion

that appears when a mouse hovers over the "Create a password" line.  *Id.*, ¶7.  Plaintiffs argued

that, similar to the defendant in *Snow v. Eventbrite, Inc.*, C20-3698, 2020 WL 6135990, at *5

(N.D. Cal. Oct. 19, 2020), Microsoft provided a single screenshot purporting to show how

content appeared on a website a decade ago, and asserted the process and sign-up "flow" was

"materially the same" since October 2012, Dkt. 7, ¶¶3-4, without saying when the screenshot

was taken, whether the image was the same one each Plaintiff would have encountered, or even

making clear whether this was the only way the page had appeared between 2012 and the

present.

Plaintiffs now, in response to the additional evidence submitted, deem Microsoft's

recollection of the account creation process inconsistent and insufficiently depicting only what

the account creation flow *could* have been at the times Plaintiffs created their accounts.  They

note that the Wayback Machine examples do not precisely match the dates on which they created

their accounts, and assert Microsoft's failure to attest that they depict screens "presented to

Plaintiffs in that exact way."  Dkt. 65 at 4.  Plaintiffs also assert that the Wayback Machine

evidence is contradictory to the flow originally depicted, unauthenticated, and unreliable.

Whether a website reasonably communicated the existence of terms is a fact-intensive

inquiry that "depends on the design and content of the website and the agreement's webpage."

*Nguyen*, 763 F.3d at 1177.  The appearance of a website, the prominence of a notice that use of

the site constitutes agreement to terms, and whether the terms are obviously accessible to the

user are "critical pieces of information necessary to support the formation of a web-based

contract." *O'Connell v. Celonis, Inc.*, C22-2320, 2022 WL 3591061, at *10 (N.D. Cal. Aug. 22, 2022) (citing *Nguyen*, 763 F.3d at 1177).

To assist in the Court's inquiry, a defendant typically submits a screenshot of the process by which it maintains a user agreed to terms, allowing for evaluation of factors "such as the size of the text, the color of the text as compared to the background, the location of the text, the obviousness of the hyperlink, and whether other elements on the screen clutter or otherwise obscure the textual notice." *Robbins v. Mscripts, LLC*, C23-1381, 2023 WL 5723220, at *5 (N.D. Cal. Sept. 5, 2023). However, in the absence of contradictory evidence, the Court properly relies on a sufficiently detailed declaration describing the account creation process, from an individual with knowledge of that process. *See, e.g., id.* ("[W]ithout any contradicting evidence about what the plaintiff saw, the court is not precluded from concluding as a matter of law that the plaintiff was on notice of [the] terms and conditions when he created his account. A contrary holding would mean that an obsolete platform is not subject to an arbitration clause merely because illustrative screenshots cannot be generated from a non-existent platform. If the declaration is sufficiently detailed, as it is here, then it paints a sufficient picture."). A party seeking to compel arbitration is not, moreover, required to provide an original screenshot of the account creation process at the precise time a plaintiff created an account. *See, e.g., Needleman v. Golden 1 Credit Union*, 474 F. Supp. 3d 1097, 1100 n.1 (N.D. Cal. 2020).

In this case, the Court requested additional information after Plaintiffs raised arguments challenging the sufficiency of the evidence, and Microsoft submitted, on the eve of oral argument, a praecipe and amended declaration only partially responsive to those arguments. *See* Dkts. 47-48, 56. Further, Microsoft asserted, both in briefing and at oral argument, that courts have repeatedly enforced its arbitration agreement even where it relied on a description of the

1    account-creation process instead of the exact screenshot that would have been presented.

2    However, in so doing, Microsoft cites to cases in which plaintiffs did not challenge notice or

3    assent.  *See Mendoza v. Microsoft Inc.*, C14-0316-MJP, 2014 WL 4540225, at *3-4 (W.D. Wash.

4    Sept. 11, 2014);  *Walsh v. Microsoft Corp.*, C14-424-MJP, 2014 WL 4168479, at *2-3 (W.D.

5    Wash. Aug. 20, 2014); *Day v. Microsoft Corp.*, C13-478-RSM, 2014 WL 243159, at *2 (W.D.

6    Wash. Jan. 22, 2014).  In any event, having now considered all of the evidence submitted, the

7    Court finds it sufficient and Plaintiffs' arguments to the contrary unpersuasive.

8           Plaintiffs offer no more than conclusory assertions as to the authenticity or reliability of

9    evidence obtained through the Wayback Machine as a general matter.  *See* Dkt. 65 at 4.  They do

10   not show or even argue the evidence submitted to the Court is inaccurate.  *See, e.g., Keller v.*

11   *Chegg, Inc.*, C22-6986, 2023 WL 5279649, at *2, n.2 (N.D. Cal. Aug. 15, 2023) (noting

12   plaintiff's failure to offer a reason for finding evidence obtained from the Wayback Machine

13   inaccurate and finding judicial notice "perfectly appropriate for a motion to compel

14   arbitration.")[3]  In the absence of a specific challenge to authenticity and considering the

15   accompanying declaration, the screenshots and corresponding webpages, and the various indicia

16

17          [3] Plaintiffs also fail to identify support for their assertion that courts in the Ninth Circuit "have
      continuously found the Wayback Machine is not an accurate source."  Dkt. 65 at 4, n.2.  To the contrary,
18    courts in this Circuit have taken judicial notice of evidence obtained through the Wayback Machine under
      Federal Rule of Evidence 201.  *See, e.g.*, *Newell v. Inland Publications Inc.*, C23-0025, 2024 WL
19    1337177, at *2 (E.D. Wash. Mar. 28, 2024); *Yuksel v. Twitter, Inc.*, C22-5415, 2022 WL 16748612, at *3
      (N.D. Cal. Nov. 7, 2022); *UL LLC v. Space Chariot, Inc.*, 250 F. Supp. 3d 596, 603-04 n.2 (C.D. Cal.
20    2017).  *See also Pohl v. MH Sub I, LLC*, 332 F.R.D. 713, 716-17 (N.D. Fla. 2019) (following "the lead of
      the overwhelming number of courts that have decided the issue and taking judicial notice of the contents
21    of Wayback Machine evidence").  *But see Virun, Inc. v. Cymbiotika, Inc.*, C22-0325, 2022 WL 17371057,
      at *4, n.4 (C.D. Cal. Aug. 18, 2022) (identifying an absence of a "clear consensus . . . as to whether, or
22    under what circumstances," the Wayback Machine constituted a source whose accuracy could not be
      reasonably questioned for purposes of Rule 201, but not deciding the issue upon finding defendants failed
      to support contention proffered exhibits were judicially noticeable for the specific purposes for which
23    they sought to introduce them); *Lindsay v. Shree Enter., LLC*, C21-0299, 2021 WL 2711225, at *3 & n.3
      (E.D. Cal. July 1, 2021) (noting Wayback Machine screenshots submitted in relation to a motion to
      dismiss were not from the relevant time period and distinguishing the procedural posture of cases in
      which courts took judicial notice of such evidence as involving summary judgment).

of authenticity contained therein, the Court finds a sufficient basis to conclude the evidence is

what Microsoft claims it is; that is, examples of what the Microsoft account creation process

looked like at times in close proximity to when Plaintiffs opened their accounts. *See* Fed. R.

Evid. 901(a) ("To satisfy the requirement of authenticating or identifying an item of evidence,

the proponent must produce evidence sufficient to support a finding that the item is what the

proponent claims it is."); *Pohl v. MH Sub I, LLC*, 332 F.R.D. 713, 716-17 (N.D. Fla. 2019)

("[C]ourts generally hold that an affidavit of a witness, when viewed in combination with

circumstantial indicia of authenticity (such as the existence of the URL, date of printing, or other

identifying information) would support a reasonable juror in the belief that the documents are

what the proponent says they are.'") (quoted and cited sources omitted).

Plaintiffs also fail to offer contradictory evidence as to what they saw when they opened

their Microsoft accounts. Plaintiffs assert only that they do not recall or remember seeing any

references to the MSA or privacy statement. Dkts. 50-52, ¶¶10-12. As discussed further below,

these bare assertions do not suffice to rebut the evidence presented or to create a dispute of fact.

*See, e.g., Cordas v. Uber Techs., Inc.*, 228 F. Supp. 3d 985, 989-90 (N.D. Cal. 2017) (finding no

genuine dispute of material fact raised and notice and assent established where plaintiff failed to

offer testimony or evidence regarding what he saw or rebutting "reasoned declaration other than

his own conclusory allegations that he never received notice of the terms and conditions and that

[the] declaration [offered by the defendant] is false and inadequate.")

Plaintiffs likewise fail to demonstrate inconsistency or contradiction undermining

Microsoft's showing. Plaintiffs identify differences in the terminology utilized and a variation in

the "flow" of when that terminology appears in the account creation process. *See* Dkt. 7

(original Fogarty declaration depicting "Next" button and previous "I agree" button), Dkt. 56-1

ORDER RE:  MOTION TO COMPEL
ARBITRATION AND STAY CASE - 21

1    & 56-2 (explaining original Fogarty declaration provided an example of the account process

2    "flow" and that a different flow could apply when a third-party email is used to create an

3    account), and Dkt. 63 (Burnside declaration with Wayback Machine exhibits and citations to

4    YouTube videos showing account creation process with "I accept" and "Create account"

5    buttons).  Plaintiffs do not, however, identify any substantive difference in the provision of

6    notice and the means of assent.  The evidence consistently shows that, during the period of time

7    in which Plaintiffs created their Microsoft accounts, a user was presented with a notice

8    containing a hyperlinked MSA in blue text, placed directly above a button the individual was

9    required to activate in order to open an account.  *See id*.

10   Nor does the assertion that a password suggestion pop-up could have concealed notice of

11   the MSA undermine Microsoft's showing.  This assertion is merely suggested as a possibility by

12   Plaintiffs' counsel and in relation to the undated screenshot provided by Microsoft.  Dkt. 48, ¶7.

13   Saeedy, Shah, and Wilkinson do not assert or even suggest they encountered this situation in

14   creating an account.  *See* Dkts. 50-52, ¶¶10-12.  The suggestion that a popup window could have

15   blocked the notice is, moreover, undercut by the examples of the account creation process in

16   2013, 2015, and 2016, all of which show notice of the MSA appears not only below the portion

17   of the screen in which a user creates a password, but also below several additional questions and

18   a verification process.  *See* Dkt. 63, ¶¶2-4 & Exs. A-C.[4]

19   The Court, finally, finds the current case distinguishable from *Snow*.  In that case,

20   defendant provided two "'exemplary'" images of how a sign-in wrap agreement would have

21   appeared on its website from 2016 to the present and asserted the website's layout was

22

23   ───────────────

     [4] For example, after creating and reentering a password in the 2013 account creation process, a
     user was prompted to (1) provide a phone number or choose a security question to allow for resetting a
     password, (2) provide a country/region and zip code, (3) enter characters to ensure the user is not a robot,
     and (4) indicate whether or not the user would like to receive promotional offers.  Dkt. 63, Ex. A.

"'substantially identical'" during that period of time. *Snow*, 2020 WL 6135990, at *4-5. As

Plaintiffs observe, the court in *Snow* noted defendant's failure to state when the website first

adopted its present appearance, which images each plaintiff would have encountered, and

whether the images were the "only ways" in which the website had appeared. *Id*., at *5-7. The

court also identified both contradictory and misleading evidence, observing, for example, that

defendant asserted one plaintiff would have seen a particular disclosure the defendant elsewhere

argued it did not utilize until several months after any of the website orders at issue in the case

had occurred. *Id*. The court concluded defendant failed to "show what the agreements looked

like during the period when the plaintiffs would have actually seen them." *Id*., at *4-10. Here,

in contrast, Microsoft provides substantively consistent and uncontradicted testimonial and

exemplar evidence showing what the account-creation process would have looked like during the

periods of time in which Plaintiffs created their accounts. The Court, as such, proceeds to

consider whether the evidence supports Microsoft's contention as to notice and assent. *See, e.g.*,

*In re Juul Labs, Inc., Antitrust Litig.*, 555 F. Supp. 3d 932, 944, 948-49 (N.D. Cal. 2021)

(distinguishing *Snow* and finding information provided in declarations and three Wayback

Machine screenshots sufficient to establish notice and assent).

       2.    <u>Notice and Assent Through Creation of Microsoft Account</u>

      The Court must determine whether the Microsoft account creation process provided

reasonably conspicuous notice of the MSA, and whether Plaintiffs took action unambiguously

manifesting assent. *See Oberstein*, 60 F.4th at 513-15. To satisfy the first part of the test, "'a

notice must be displayed in a font size and format such that the court can fairly assume that a

reasonably prudent Internet user would have seen it.'" *Id.* at 515 (quoting *Berman*, 30 F.4th at

856). The court considers the "'conspicuousness and placement'" of the hyperlinked terms, any

other notices given, the website's general design, and the context of the transaction. *Id.* at 515, 517 (quoting *Nguyen*, 763 F.3d at 1177).

Microsoft shows that, since no later than October 2012, a user creating a Microsoft account encounters a screen stating that, by choosing or clicking on a button, the user indicates they agree with the MSA and privacy statement. *See* Dkt. 56-2, ¶¶3-5 (showing "Next" button and describing previous "I agree" button); Dkt. 63, ¶¶2-4 & Exs. A-C (December 2013 and March 2015 screenshots with "I accept" and "Create account" buttons"; and November 2016 screenshot, supplemented by citations to April 2015 and April and November 2016 YouTube videos showing "Create account" buttons). In each instance, the statement explaining that clicking or choosing the button means that the user agrees to the MSA and privacy statement appears directly above the button the user must activate, and MSA appears in blue, hyperlinked text, distinguishable from the white background and surrounding black text. *See id*. The hyperlink brings the user to the MSA, which, on the first page, notes the inclusion of a binding arbitration agreement and directs review of the specific arbitration provision. *See* Dkt. 56-4, ¶6; Dkt. 7, Exs. A-B.

The visual aspects of the account creation process support the conclusion that Microsoft provided reasonably conspicuous notice of the MSA and its terms. Indeed, courts "routinely" find such a presentation sufficient. *Houtchens v. Google LLC*, 649 F. Supp. 3d 933, 944 (N.D. Cal. 2023) (approving hyperlinks presented in blue text, distinguishable from otherwise gray text, next to a box a user must select to accept the terms, and appearing on uncluttered screens) (citing *Adibzadeh v. Best Buy, Co. Inc.*, C20-6257, 2021 WL 4440313, at *6 (N.D. Cal. Mar. 2, 2021) (users required to agree to website's terms and conditions before they can proceed, with terms and conditions "offset in a blue text, hyperlinked text.")). *See also Patrick v. Running*

1    *Warehouse, LLC*, 93 F.4th 468, 477 (9th Cir. 2024) (website with "'Place Order'" button directly

2    above statement requiring consumer to confirm age and agree to privacy policy and terms of use,

3    on uncluttered page and with "terms of use" in bright green text containing a hyperlink);

4    *Oberstein*, 60 F.4th at 515-16 (confirmation button appeared above text informing user that "by

5    clicking on button, 'you agree to our Terms of Use[,]'" with "Terms of Use" in bright blue font

6    containing a hyperlink).  *Cf. Berman*, 30 F.4th at 856-57 (finding inconspicuous, tiny, gray,

7    underlined font "insufficient to alert a reasonably prudent user" of a clickable link, and

8    describing "[c]ustomary design elements" for a hyperlink as including "contrasting font color

9    (typically blue) . . . which can alert a user that the particular text differs from other plain text in

10   that it provides a clickable pathway to another webpage.")

11         With respect to context, courts consider whether a transaction "reflected the

12   contemplation of 'some sort of continuing relationship' that would have put users on notice for a

13   link to the terms of that continuing relationship."  *Oberstein*, 60 F.4th at 517 (citing *Sellers*, 289

14   Cal. Rptr. 3d 1).  *See also Ghazizadeh v. Coursera, Inc.*, C23-5646, __ F. Supp. 3d __, 2024 WL

15   3455255, at *7 (N.D. Cal. June 20, 2024) ("[A] user engaging in a full registration process, as

16   opposed to a one-time purchase, is more likely to expect a continuing relationship that would put

17   her on notice for a link to the terms of that continuing relationship.")  Here, in creating a

18   Microsoft account for use in relationship to various Microsoft products and services, a consumer

19   is more likely to expect a continuing relationship.  *See, e.g., Keebaugh*, 100 F.4th at 1019-20

20   (noting forward-looking nature of the parties' relationship and that "users would understand that

21   their use of an app that allows for in-app purchases would be governed by some terms of use");

22   *Ghazizadeh*, 2024 WL 3455255, at *7 (noting that, unlike a "'one-and-done' traditional

23

1  website", users of the defendant's services would or should expect their "access to the platform

2  would be continual and governed by some terms of use.") (citations omitted).

3       To satisfy the second part of the test applied to on-line agreements, there must be

4  unambiguous manifestation of assent.  The click of a button "can be construed as an

5  unambiguous manifestation of assent only if the user is explicitly advised that the act of clicking

6  will constitute assent to the terms and conditions of an agreement."  *Berman*, 30 F.4th at 857

7  (citation omitted).  "[T]he notice must explicitly notify a user of the legal significance of the

8  action she must take to enter into a contractual agreement."  *Id*. at 858.  Under Ninth Circuit law,

9  text informing a user that, by clicking a button, "you agree" to terms of use provides for

10  unambiguous manifestation of assent.  *See, e.g.*, *Oberstein*, 60 F.4th at 513 ("The language 'By

11  continuing past this page and clicking [the button], you agree to our Terms of Use' clearly

12  denotes 'that continued use will act as a manifestation of the user's intent to be bound.'")

13  (quoting *Nguyen*, 763 F.3d at 1177).

14       Microsoft here shows an account creation process in which a user is informed that

15  choosing or clicking on a button means that a user agrees to the MSA and privacy statement.

16  This process provides for unambiguous manifestation of assent.  *See, e.g., Cavanaugh*, 2024 WL

17  3202567, at *8 ("The language used here – '[b]y placing an order, you agree to our Terms of Use

18  & Privacy Policy' – located just below the checkout button, is sufficient.")

19       In response to this evidence, Plaintiffs assert that they do not believe they have ever been

20  presented with the MSA or its terms.  Dkts. 50-52, ¶3.  They have no recollection of seeing any

21  references or hyperlinks to the MSA or privacy statement during the account creation process,

22  and note that, whether or not a reference or hyperlink appeared, they were not required to open,

23  click on, or read the MSA or a privacy statement.  *Id.*, ¶¶10-12.  However, neither Plaintiffs'

inability to recall seeing reference to the terms, nor their failure to review terms overcomes the

evidence of assent.  *See, e.g., Houtchens*, 649 F. Supp. 3d at 944 (plaintiffs' bare assertion they

did not recall process and "may not have read" terms did not overcome evidence they checked a

box agreeing to terms in creating accounts) (citing *Crawford v. Beachbody, LLC*, C14-1583,

2014 WL 6606563, at *2-3 (S.D. Cal. Nov. 5, 2014) (plaintiff assented to terms even though she

did "not recall seeing or agreeing to any terms and conditions" on a website), and *Molina v.

Scandinavian Designs, Inc.*, C13-4256, 2014 WL 1615177, at *3 (N.D. Cal. Apr. 21, 2014)

("[O]ne who accepts or signs an instrument, which on its face is a contract, is deemed to assent

to all its terms, and cannot escape liability on the ground that he has not read it.")); *Harbers v.

Eddie Bauer, LLC*, C19-1012-JLR, 2019 WL 6130822, at *4-6 (W.D. Wash. Nov. 19, 2019)

("Courts have rejected the argument that there was no mutual assent on the grounds that a party

failed to read or fails to remember the terms of a contract.").  Nor do these assertions suffice to

create a dispute of fact.  *See, e.g., Britt v. ContextLogic, Inc.*, C20-4333, 2021 WL 1338553, at

*4 (N.D. Cal. Apr. 9, 2021) ("Because mutual assent is measured objectively, and because it is

undisputed that plaintiff signed-in to the Wish app using the above screen, there is no genuine

dispute that she objectively manifested her assent to the terms.")  *See also Bennett v. T-Mobile

USA, Inc.*, C22-1805-LK, 2024 WL 229580, at *12-13 (W.D. Wash. Jan. 22, 2024) (finding

attestations plaintiff never knowingly accepted arbitration agreement and did not recall receiving

or seeing information "irresolute assertions fail[ing] to constitute the unequivocal denial required

to establish a genuine dispute of fact[]" and "the type of 'convenient memory lapse' that is

insufficient to generate a dispute of fact[]" under Sixth Circuit law).[5]

---

[5] In responsive supplemental briefing and for the first time, Plaintiffs assert that a three-step burden shifting framework applies to the determination of an agreement to arbitrate in this case under California law.  Dkt. 65 at 2-3.  Under that framework, the moving party bears the initial burden of

1      Plaintiffs also assert that, in creating accounts, they merely pressed "enter" on a

2   keyboard.  Dkts. 50-52, ¶10.  They argue Microsoft cannot establish that the act of pressing enter

3   constitutes unambiguous manifestation of assent, especially where, for example, Microsoft

4   specifically instructed users to "choose" the "Next" button.  Plaintiffs state that Microsoft did not

5   advise that pressing "enter", or merely creating an account, would constitute assent to the MSA,

6   and argue users therefore reasonably understood that, by pressing enter, they were simply

7   recording their password credentials for their account.  *See id*.

8      Again, a sign-in wrap agreement may be found enforceable so long as the website

9   provides reasonably conspicuous notice of terms and the consumer takes "some action, such as

10  clicking a button or checking a box," reflecting their unambiguous manifestation of assent.

11  *Oberstein*, 60 F.4th at 515.  Here, the two different actions at issue – pressing enter or utilizing a

12  mouse to click a button – are equivalent.  Both are preceded by notice of the MSA and privacy

13  statement, and one or the other is required to create a Microsoft account.  Plaintiffs do not

14  identify any case law supporting their contention that a sign-in wrap agreement is not created

---

producing evidence of a written agreement by, for example, attaching a copy of the agreement purporting to contain the opposing party's signature, the burden then shifts to the opposing party to submit evidence creating a factual dispute as to the authenticity of the agreement, and, if satisfied, the burden shifts back to the moving party to prove by a preponderance of the evidence that a valid agreement exists.  *See Jean-Baptiste v. California Coast Credit Union*, C23-0533, 2024 WL 460241, at *2-4 (S.D. Cal. Feb. 6, 2024); *Gamboa v. Ne. Cmty. Clinic*, 72 Cal. App. 5th 158, 165-66, 179, 286 Cal. Rptr. 3d 891 (2021).  However, Plaintiffs do not submit evidence creating a factual dispute or cite to case law supporting application of the three-step framework in this case.  *Cf. Jean-Baptiste*, 2024 WL 460241, at *2-4 (finding an absence of admissible evidence creating a dispute of fact as to the authenticity of a signature and that, even considering the "bare assertions" offered, a declaration from a custodian of records sufficed to rebut the challenge to authenticity); *Gamboa*, 72 Cal. App. 5th at 170 (in response to plaintiff's declaration that she did not recall signing an agreement and would not have done so if she were aware of it, declarant for defendant failed to provide specific details about the circumstances of the alleged execution of the contract and offered little more than a bare statement that plaintiff entered into a contract).

where a consumer pressed enter, rather than utilizing a mouse to click on a button.[6]  Nor is the

Court persuaded by the contention that a reasonable consumer would understand that only those

individuals who use a mouse to click a button (or are able to use a mouse) would enter into a

contract.  Instead, it is reasonably understood that, whether Plaintiffs clicked the button with a

mouse or by pressing enter on a keyboard, they took an action manifesting their assent.

There is, in sum, evidence that Saeedy, Shah, and Wilkinson created Microsoft accounts

through a process in which they were provided reasonably conspicuous notice of terms, the terms

include a binding arbitration clause, and they manifested assent to the terms by clicking a button

or pressing enter to create their Microsoft accounts.  These Plaintiffs were, as such, on inquiry

notice of the MSA and its terms through a sign-in wrap agreement to which they assented when

they created their accounts.[7]

---

[6] None of the case law cited by Plaintiffs supports their contention.  *See Berman*, 30 F.4th at 857-58 (stating that "merely clicking on a button on a webpage, viewed in the abstract, does not signify a user's agreement to anything[,]" that the "click of a button can be construed as an unambiguous manifestation of assent only if the user is explicitly advised that the act of clicking will constitute assent to the terms and conditions of an agreement[,]" and that the "presence of 'an explicit textual notice that continued use will act as a manifestation of the user's intent to be bound' is critical to the enforceability of any browsewrap-type agreement.") (quoting *Nguyen*, 763 F.3d at 1177); *Knutson*, 771 F.3d at 565-69 (consumer did not assent where he was not given notice of terms at the outset, nor understood continued use of a service would bind him to terms he later received); *Sellers*, 73 Cal. App. 5th at 477-79 (contrasting scrollwrap and sign-in wrap agreements as a general matter, and acknowledging courts recognize the validity of sign-in wrap agreements, most of which involve consumers "signing up for an ongoing account" and reasonably contemplating they were "entering into a continuing, forward-looking relationship."; finding insufficiently conspicuous notice in a case where consumers who "submitted a single question for a 'trial' and a one-time fee of $5[]" were automatically enrolled in a "costly recurring monthly membership.")  *See also* Dkt. 61 at 3, n.2 (citing cases supporting the proposition that silence does not constitute acceptance of an offer).

[7] Plaintiffs also note that a Microsoft account does not, by definition, apply to work or school accounts.  *See* Dkt. 56-2, ¶2 ("A Microsoft account is a service Microsoft provides to consumers and is distinct from business services such as accounts provided for a workplace or school.")  They assert Microsoft's failure to establish that their accounts, which have been and continue to be used at least in part for work and/or school/academic purposes, *see* Dkt. 1-1, ¶¶7-24, are even subject to the terms of the MSA.  However, it remains that Plaintiffs have Microsoft accounts and allege they were frequently logged in to those accounts while using Edge for a variety of personal matters.  *See id.*  They do not

---

ORDER RE:  MOTION TO COMPEL
ARBITRATION AND STAY CASE - 29

1    D.    <u>Agreement to Arbitrate Pursuant to Updated MSAs</u>

2        Microsoft also contends Saeedy, Shah, and Wilkinson received notice of and assented to

3    materially identical MSAs through pop-up "interrupt" notices and/or emails.  As with the

4    original agreement, Microsoft bears the burden of showing it provided notice of new contractual

5    terms and mutual assent.  *Jackson v. Amazon.com, Inc.*, 65 F.4th 1093, 1099 (9th Cir. 2023)

6    (stating as such with respect to both California law and "generally applicable principles of

7    contract law").  The Court must therefore consider whether the emails and interrupt notices

8    provided reasonably conspicuous notice of updated terms and whether there is evidence of

9    unambiguous manifestation of assent.  *See id.*

10        Microsoft provides declarations from both Fogarty and Microsoft Principal Product

11    Manager Keith Walsh attesting to its practice of providing notice of updated terms through

12    interrupt notices and emails.  Dkts. 56-2 & 64.  Fogarty attests that a notice appears when a user

13    logs in to a Microsoft service while a notice is active, provides a link to the full text of the MSA

14    labeled "Learn More", and, to be dismissed, requires that a user click on a button acknowledging

15    the notice.  Dkt. 56-2, ¶7(b); Dkt. 7, Ex. D.  Walsh attests that, since no later than approximately

16    2014, it has been Microsoft's business practice to send emails regarding each MSA update

17    through an automated system, before the update takes effect, to the registered email address of

18    any Microsoft accountholder who has logged in to their Microsoft account within the past two

19    years.  Dkt. 64, ¶¶2-4.  Walsh attests that Microsoft only retains records of the emailing of such

20    notices for a period of approximately one year.  *Id.*, ¶¶2-3.

21        Fogarty provides a copy of a 2022 interrupt notice showing how it would appear on a

22    user's screen.  Dkt. 56-2, ¶7(b); Dkt. 7, Ex. D.  The notice states that Microsoft is updating its

23

---

explain why they would not be subject to the terms of the MSA simply because they at times used a
consumer service for work and/or school/academic purposes.

1    terms and "want[s] to take this opportunity to notify you about [the] update," and contains a

2    "Learn more" hyperlink to the MSA above a "Next" button.  Dkt. 7, Ex. D.  Together, Fogarty

3    and Walsh provide copies of the email sent regarding the 2019, 2020, 2021, and 2023 MSA

4    updates.  Dkt. 56-2, ¶7(a); Dkt. 7, Ex. C; Dkt. 64, ¶4, Exs. A-C.  The emails provide hyperlinks,

5    labeled "here", to both the updated MSA and an "FAQ" page summarizing changes, and state

6    that, by continuing to use Microsoft's products and services on or after a specified date, the user

7    is "agreeing to the updated" MSA, and that users who do not agree "can choose to discontinue

8    using the products and services, and close [their] Microsoft account before [the] terms become

9    effective."  Dkt. 7, Ex. C ("You can read the entire Microsoft Services Agreement here.  You can

10   also learn more about these updates on our FAQ page here, including a summary of the most

11   notable changes."); *accord* Dkt. 64, Exs. A-C.[8]

12          Microsoft's records show that Saeedy acknowledged an update through an interrupt

13   notice on September 28, 2022 at 11:22:13 p.m., and was sent an email regarding the 2023 update

14   on August 21, 2023, at 10:47:57 p.m., and that Wilkinson acknowledged an update through an

15   interrupt notice on October 1, 2022 at 10:06:19 a.m., and was sent an email regarding the 2023

16   update on August 31, 2023, at 1:30:43 a.m.  Dkt. 56-2, ¶8(a)-(b).  Walsh attests that, according to

17   Microsoft's business records, Shah last logged in to his Microsoft account in November 2019,

18   and therefore would have, pursuant to Microsoft's business practices, been sent notice of the

19   August 2019, October 2020, and June 2021 MSA updates by email.  Dkt. 64, ¶¶2-3.

20          Microsoft also points to the "continuing use" language in each version of the MSA that

21   Saeedy, Shah, and Wilkinson assented to when they created their Microsoft accounts.  The

22   MSAs provide that Microsoft will inform users of changes and that continued use of covered

23   ───────────────

        [8] The emails also appear to include, at the bottom, three blue boxes containing additional
clickable links to the MSA, Privacy Statement, and FAQs.  *See* Dkt. 7, Ex. C; Dkt. 64, Exs. A-C.

1    services will constitute acceptance of those changes.  Dkt. 7-2 at 2 (October 2012 MSA § 1.4),

2    16 (July 2014 MSA § 1.3), and 59 (September 2016 MSA § 7).  Microsoft notes that the

3    accounts of Saeedy, Shah, and Wilkinson remain open, Dkt. 56-2, ¶8, and their allegations that

4    they have used Microsoft Edge since at least June 2021 and were frequently logged in to their

5    Microsoft accounts when using Edge, Dkt. 1-1, ¶¶7, 9, 11, 13, 15, 18.  Based on this and the

6    evidence described above, Microsoft argues Saeedy, Shah, and Wilkinson agreed to the most

7    recent, 2023 version of the MSA by clicking on a "Learn More" button to dismiss an interrupt

8    notice, through their receipt of emails regarding MSA updates, and/or through the fact their

9    accounts remain open.

10         Plaintiffs, in response, deny that the interrupt notice provides an ability to assent to or

11   even review changed terms, and assert Microsoft's failure to show they actually received notice

12   emails or in some way manifested assent to an updated MSA.  Saeedy and Wilkinson attest that

13   they do not recall interacting with interrupt notices or receiving or reading emails regarding

14   updates.  Dkts. 50 & 52, ¶¶16-18.[9]  The Court, for the reasons set forth below, is not persuaded

15   by these arguments and finds a sufficient showing as to both notice of and assent to updated

16   terms.

17         The interrupt notice states, at the top, "We're updating our terms", in text that is bold and

18   larger than the remainder of the text in the notice, proceeds to state that Microsoft is updating the

19   MSA and is providing notification of the update, and provides a "Learn more" hyperlink in blue

20

21        [9] Plaintiffs also assert the existence of material changes to the MSA, pointing to the fact the 2022

22   and 2023 MSAs expressly reserve arbitrability issues for the court, while prior versions provided for
     delegation of arbitrability issues other than the class action waiver.  *See* Dkt. 7, Exs. A-B.  They do not
     identify any other changes and Microsoft asserts that, other than the elimination of the delegation clause,

23   the arbitration provision has had the same definition of dispute and a class action waiver since 2012.
     Because the issue of arbitrability goes to scope, it is addressed below.  The Court likewise addresses
     below Plaintiffs' arguments with respect to changes to the privacy statement.

ORDER RE:  MOTION TO COMPEL
ARBITRATION AND STAY CASE - 32

1    text, offset from the white background and otherwise black text in the notice, and above a blue

2    "Next" button.  Dkt. 7, Ex. D.  The email advises that Microsoft is updating the MSA, contains

3    "here" hyperlinks, in blue, underlined text, offset from surrounding black, non-underlined text, to

4    both the updated MSA and an FAQ page of the "most notable" changes.  *Id*., Ex. C; Dkt. 64-2,

5    Exs. A-C.  Accordingly, and contrary to Plaintiffs' contention, both the interrupt notice and

6    emails provide an ability to review and reasonably conspicuous notice of the updated terms.

7           Microsoft also presents evidence of assent.  As Microsoft observes, courts have found

8    notice of updated terms provided through email and followed by "continued use" sufficient to

9    show assent.  *See, e.g., Kamath v. Coinbase, Inc.*, C23-3533, 2024 WL 950163, at *4 (N.D. Cal.

10   Mar. 5, 2024) (email and subsequent continued use of services "enough to establish reasonably

11   conspicuous notice and assent" to updated terms); *West v. Uber Techs.*, C18-3001, 2018 WL

12   5848903, at *5 (C.D. Cal. Sept. 5, 2018) ("Courts have found that when consumers receive

13   emails such as this one [e.g., having a subject line stating that Uber had updated its terms of use,

14   including in the body that the arbitration agreement had been revised, and providing a link to the

15   updated terms], continued use of the service or product constitutes assent to the updated terms");

16   *In re Facebook Biometric Info. Priv. Litig.*, 185 F. Supp. 3d 1155, 1167 (N.D. Cal. 2016)

17   (plaintiffs "were provided notice that the terms of the user agreement were changing through an

18   email from Facebook sent directly to the email addresses each plaintiff had on file with

19   Facebook" and "individualized notice in combination with a user's continued use is enough for

20   notice and assent").  *See also Sadlock v. Walt Disney Co.*, C22-9155, 2023 WL 4869245, at *12-

21   13 (N.D. Cal. July 31, 2023) (emails followed by continued use sufficient to establish assent

22   even where notice and assent had not been shown in relation to original agreement); *In re Uber*

23   *Techs., Inc.*, C18-2826, 2019 WL 6317770, *4 (C.D. Cal. Aug. 19, 2019) (stating that, "even if

1    [plaintiff's] initial registration processes were somehow flawed, she was still on notice of the

2    updated terms.")  Microsoft here shows Plaintiffs agreed to earlier MSAs containing continuing

3    use provisions, *see* Dkt. 7-2 at 2, 16, 59; that Saeedy and Wilkinson interacted with interrupt

4    notices advising them of updates and that Microsoft delivered emails to Saeedy, Shah, and

5    Wilkinson advising them of updates and that continued use of Microsoft's products and services

6    constituted agreement, Dkt. 56-2, ¶8; Dkt. 7, Ex. C; Dkt. 64-2, Exs. A-C; and that all of their

7    accounts remain open, Dkt. 56-2, ¶8.

8         Plaintiffs do not offer any evidence to counter Microsoft's showing.  They instead rely on

9    the fact that Saeedy and Wilkinson do not recall interacting with interrupt notices or receiving or

10   reading emails regarding updates.  *See* Dkts. 50 & 52, ¶¶16-18.  Nor do Plaintiffs offer evidence

11   to counter, or even address, Microsoft's showing that, pursuant to its routine business practice,

12   Shah would have been sent emails regarding updates to the 2019, 2020, and 2021 MSAs.  *See*

13   Dkts. 62-65.[10]  The Court, in the absence of any such evidence, concludes that Saeedy, Shah, and

14   Wilkinson assented to updated terms.  *See, e.g.*, *Rendon v. T-Mobile USA, Inc.*, C24-1666, 2024

15   WL 4284661, at *3 (C.D. Cal. Aug. 30, 2024) (finding assent to emailed updated terms where

16   plaintiff did not dispute continuing use of service or provide evidence she opted out, and other

17   evidence showed she had been previously afforded sufficient notice of arbitration provision);

18   *Ghazizadeh*, 2024 WL 3455255, at *13 (finding assent to original terms containing continuing

19   use provision, combined with continued use sufficed to demonstrate manifestation of assent to

20   updated terms sent directly to email address on file; noting plaintiff did not submit any counter

21   evidence that he did not receive the email update).  *Cf. Jackson*, 65 F.4th at 1098-1101 (Amazon

22

23        [10] Microsoft provided the evidence as to its routine practices and in relation to Shah in a
     supplemental brief and declaration filed on October 11, 2024, Dkts. 62-63, and Plaintiffs had the
     opportunity to respond to that evidence in their supplemental response filed on October 18, 2024, Dkt. 65.

1    failed to show notice and assent where it did not produce a copy of an update email allegedly

2    sent, any evidence the email was received, or even a description of the email, and provided "only

3    a declaration with a vague statement that notice of updated terms was sent via email";

4    distinguishing cases in which courts were provided emails sent and allowing for a determination

5    as to notice).

6          The Court specifically concludes that, while the evidence suffices to show Saeedy and

7    Wilkinson received notice of and assented to the most recent, 2023 MSA, it shows only that

8    Shah received notice of and assented to the 2021 and prior MSAs.  The Court declines to find

9    Shah bound to the 2022 or 2023 MSAs based solely on the fact that his account remains open

10   and the allegations in the Complaint.  Neither Shah's allegations, his declaration offered in

11   opposition to the motion to compel arbitration, nor any evidence presented by Microsoft shows,

12   for example, that he was emailed a notice of the updated 2022 or 2023 terms.  The evidence

13   therefore does not suffice to demonstrate he received notice of and assented to those terms.

14   E.    Scope of Agreement to Arbitrate

15         Having found that agreements to arbitrate exist, the Court turns to the question of

16   whether the agreements encompass the parties' dispute.  As reflected below, this question

17   necessitates separate consideration of the 2021 and 2023 MSAs.

18         1.    2021 MSA

19         Parties to a contract may "agree to have an arbitrator decide, not only the merits of a

20   particular dispute but also gateway questions of arbitrability, such as whether the parties have

21   agreed to arbitrate or whether their agreement covers a particular controversy." *Henry Schein,*

22   *Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 67-68 (2019) (cleaned up and quoting *Rent-A-*

23   *Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010)).  Where parties include a "delegation"

clause, it is "'simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other.'" *Id.* at 68 (quoting *Rent-A-Ctr., W., Inc.*, 561 U.S. at 70).  Accordingly, if a valid agreement exists and delegates arbitrability issues to an arbitrator by "'clear and unmistakable'" evidence, "a court may not decide the arbitrability issue." *Id.* at 69 (quoted and cited sources omitted).  *See also Caremark, LLC v. Chickasaw Nation*, 43 F.4th 1021, 1029 (9th Cir. 2022) ("[A] valid – i.e., enforceable – delegation clause commits to the arbitrator nearly all challenges to an arbitration provision[,]" including "whether the agreement covers a particular controversy" and "whether the arbitration provision is enforceable at all.") (footnote and citation omitted).  Under Ninth Circuit law, "incorporation of the AAA [(American Arbitration Association)] rules constitutes clear and unmistakable evidence that contracting parties agreed to arbitrate arbitrability." *Brennan v. Opus Bank*, 796 F.3d 1125, 1130-31 (9th Cir. 2015).[11]

In this case, the parties assert and the evidence shows that, unlike the 2022/2023 MSAs, the 2021 MSA delegates issues of arbitrability to the arbitrator.  *See* Dkt. 47 at 24; Dkt. 53 at 16; Dkt. 7-1 at 189 (2021 MSA § 15(d) ("Under AAA rules, the arbitrator rules on his or her own jurisdiction, including the arbitrability of any claim.")).  *Cf.* Dkt. 7-1 at 26, 220 (2022 and 2023 MSAs § 15(d) (giving courts "exclusive authority . . . to decide arbitrability")).  As such, the

---

[11] In *Brennan*, 796 F.3d at 1131, the Ninth Circuit addressed an arbitration agreement between sophisticated parties.  However, courts have since applied *Brennan's* holding to disputes involving non-sophisticated parties.  *See, e.g., J.A. through Allen v. Microsoft Corp.*, C20-0640-RSM-MAT, 2021 WL 1723454, at *8 (W.D. Wash. Apr. 2, 2021) (applying *Brennan* to a dispute between Microsoft and consumers and citing cases finding same with respect to other consumer transactions), *report and recommendation adopted*, 2021 WL 1720961 (W.D. Wash. Apr. 30, 2021).  *See also G.G. v. Valve Corp.*, 799 F. App'x 557, 558-59 (9th Cir. Apr. 3, 2020) (concluding teenagers clearly and unmistakably agreed to arbitrate questions of arbitrability given the agreement's incorporation of AAA rules).

question of whether the 2021 MSA encompasses the dispute between Microsoft and Shah is not

for this Court to decide, and the Court limits its consideration of scope to the 2023 MSA.[12]

2.    2023 MSA

If the scope of an agreement is clear, a court must enforce its terms as written. *United

States ex rel. Welch v. My Left Foot Children's Therapy, LLC*, 871 F.3d 791, 796 (9th Cir. 2017).

"'[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of

arbitration.'" *Columbia Export Terminal, LLC v. Int'l Longshore and Warehouse Union*, 23

F.4th 836, 847 (9th Cir. 2022) (quoting *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S.

287, 298 (2010)). *See also Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*, 473 U.S. 614,

626 (1985) ("[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor

of arbitration, whether the problem at hand is the construction of the contract language itself or

an allegation of waiver, delay, or a like defense to arbitrability.") (internal quotation marks and

quoted sources omitted). Arbitration is nevertheless "strictly a matter of consent" and the Court

may submit to arbitration "'only those disputes . . . that the parties have agreed to submit.'"

*Goldman, Sachs & Co.*, 747 F.3d at 742 (quoting *Granite Rock Co.*, 561 U.S. at 299-302). A

presumption favoring arbitrability therefore applies "only where the scope of the agreement is

ambiguous as to the dispute at hand," and is adhered to only where not rebutted. *Id*. (emphasis

removed and citations omitted).

In determining whether a dispute must be arbitrated, the Court looks to both the content

of the arbitration clause and the nature of the dispute. *Jackson*, 65 F.4th at 1101. "To be

arbitrable, the dispute must relate to the contract." *Id.* The Court must examine the factual

---

[12] At oral argument, Plaintiffs suggested Microsoft had waived this issue, while Microsoft stated it was only relevant if the Court were to find the 2022 or 2023 MSAs did not apply. The Court agrees with Microsoft and concludes, as Plaintiffs argued in their opposition brief, Dkt. 53 at 16, that prior versions of the MSA delegate issues of arbitrability to the arbitrator.

allegations in the Complaint and determine whether they fall within the scope of the clause. *Id.* (citation omitted). Where an agreement contains a broad arbitration clause, the factual allegations must at least "touch matters" covered by the agreement containing the arbitration clause. *Id*. (internal quotation marks to *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 721 (9th Cir. 1999), and *Mitsubishi Motors Corp.*, 473 U.S. at 624 n.13, omitted).

In this case, the 2023 arbitration clause provides for arbitration of any dispute and defines dispute "as broad as it can be[,]" including "any claim or controversy" concerning "the Services, the software related to the Services, . . . your Microsoft account, . . . or these Terms[.]" Dkt. 7-1 at 26. The agreement indicates that it covers Microsoft consumer products, websites, and services identified in a hyperlink and a list of "Covered Services" at the end of the agreement. *Id*. at 2, 32-35. The agreement also links to the Microsoft privacy statement, and reflects that that statement describes how a user's data and on-line content is collected, used, and processed, and that use of "Services" or agreement to "these Terms" indicates consent to Microsoft's collection, use, and disclosure of content and data as described in the privacy statement. *Id*. at 2.

Plaintiffs claim the Microsoft Edge browser surreptitiously intercepts and collects users' private data for Microsoft's use. *See* Dkt. 1-1. They allege the collected data is associated with unique user identifiers, and/or "cookies" (i.e., small text files containing unique data by which to identify a user) that Microsoft installs on users' devices; that Microsoft links or binds private user data to individual users through the unique identifiers and sends the data to several Microsoft-controlled servers; that, in so doing, Microsoft intercepts, collects, and processes personally identifiable private data without users' consent; and that Microsoft "fails to conspicuously present its flawed and deficient Privacy Statement and Terms of Use to users and thus these electronic documents have no legal effect." *Id*., ¶¶2-5.

Microsoft argues that Plaintiffs' claims fall within the MSA's broad definition of dispute because:  (1)  their claims concern their Microsoft accounts, which Plaintiffs allege they used to browse on Edge, and which are a covered service under the MSA; (2) they allege Microsoft collected their search history when they used Bing, another covered service, as their default search engine; and (3) their claims concern Microsoft's alleged collection of their data, a matter falling squarely within the privacy policies and disclosures incorporated by reference in the MSA and therefore encompassed as a dispute about the terms of the MSA.  Microsoft asserts that its privacy statement, which explains how Microsoft collects data from users and authorizes its use in certain ways, will be central to Plaintiffs' claims that they never consented to the alleged data collection and use.  *See id.*, ¶¶186-90.

Plaintiffs argue that none of the three factors identified by Microsoft are central to their allegations.  They note that Edge is not one of the 133 Covered Services expressly included in the MSA, *see* Dkt. 7-1 at 33-35, and deny that their allegations are rooted in any claim or controversy concerning the use of Microsoft accounts or their functionality.  They assert that the central issue in this case is that an individual's use of Edge, whether the user is signed in to a Microsoft account or not, allows Microsoft to surreptitiously collect users' data in violation of their rights.  *See* Dkt. 1-1, ¶¶34-45, 209-365.  They deem Bing irrelevant and assert that their claims are limited to the Yahoo search engine only.  *See id.*, ¶71.

As related to the privacy statement, Plaintiffs point to a "Change History" as showing some fifty changes to the statement in the last decade, as well as the absence of a consolidated statement at the time Saeedy and Wilkinson created their Microsoft accounts.  Dkt. 48, Ex. A at 34-35.  Plaintiffs also deny that the MSA informs consumers the privacy statement is a part of the MSA or subsumed within the definition of its "Terms," or that it covers the type of data –

1    webpage content – that they allege Microsoft intercepts and collects.  They note that the Edge

2    EULA similarly discusses the privacy statement, and argue that any questions as to whether the

3    EULA or MSA governs the parties' relationship and whether their claims are encompassed

4    within the MSA's arbitration provision are ambiguous and should be resolved in their favor.

5          Plaintiffs' arguments minimize the extent to which their allegations relate to their

6    Microsoft accounts.  However, whether or not "central" to their claims, it remains that Plaintiffs

7    allege the impermissible interception of their private data when a user is logged in to a Microsoft

8    account.  That is, in addition to alleging Edge provides for the identification of users regardless

9    of whether they are logged in to a Microsoft account, *see, e.g.*, Dkt. 1-1, ¶¶51, 56, 63, 76, 83, 88,

10   91, Plaintiffs allege they were frequently logged in to their Microsoft accounts while using Edge,

11   *id.*, ¶¶9, 13, 18, and that Microsoft collects and processes unique user identifiers when a user is

12   logged in to a Microsoft account, *see, e.g.*, *id.*, ¶¶47, 60, 80 (alleging that, when a user opens

13   Edge and is either already logged in or logs in to a Microsoft account, Edge collects and

14   processes two unique user identifiers "together in the same data packet, 'binding' them together

15   for the remainder of the web-browsing session[,]" and allowing Microsoft to link users to their

16   internet browsing and online shopping activities and to identify individual users); and *id.*, ¶¶51,

17   56, 63, 76, 83 & 88 (alleging that, if a user was logged in to a Microsoft account and not using an

18   "inPrivate" window, Microsoft can also utilize unique identifiers to link the user to search

19   queries and visited "URLs" (uniform resource locators) and identify the user).  Indeed, as

20   described by Plaintiffs in opposing the motion to compel arbitration, the only difference is that

21   Microsoft is "able to collect *additional* personal user data from Edge users when they are logged

22   [in to] their Microsoft accounts."  Dkt. 47 at 10 (emphasis retained; citations omitted).

23

Plaintiffs support their argument that Bing is irrelevant and that they limit their claims to the Yahoo search engine with a citation to a single paragraph in the Complaint discussing Yahoo searches conducted in "Edge Version 92." Dkt. 1-1, ¶71 ("Unbeknownst to Version 92 users not utilizing an inPrivate window, when a user sets his default search engine to Yahoo and runs a search through the Edge . . . , Edge collects, intercepts and sends to Defendant the user's search queries. . . . The same occurs if a user navigates to Yahoo's website and enters a search through the search bar located there.") However, that paragraph is not included in the portions of the Complaint discussing "Edge Version 90", "Edge Version 93", or prior or later versions of Edge, *Id.* ¶¶46-48, 79-93. Moreover, Plaintiffs explicitly allege that they utilized Bing in interacting with the Edge browser, and that Bing served as the default search engine for Saeedy and Shah. *Id.*, ¶¶9, 13, 18. In short, Plaintiffs do not identify and the Court does not find any basis for concluding Plaintiffs limit their claims to the Yahoo search engine.

As related to the privacy statement, the Change History reflects that Microsoft adopted a consolidated statement in July 2015, *see* Dkt. 48 at 35, well prior to the 2023 MSA and when Plaintiffs allege they began using Edge. Prior versions of the privacy statement are not relevant to the question of scope. There is, moreover, no dispute that Plaintiffs allege Microsoft's impermissible interception of their private data and that Microsoft's privacy statement has "no legal effect." Dkt. 1-1, ¶5.

There is, on the other hand, a dispute as to whether the terms of the MSA include the privacy statement. The MSA states: "Where processing is based on consent and to the extent permitted by law, by agreeing to these Terms, you consent to Microsoft' collection, use and disclosure of Your Content and Data as described in the Privacy Statement." Dkt. 7-1 at 2 (2023 MSA § 1). The arbitration clause defines dispute broadly and extends to any claim or

1    controversy concerning "these Terms[.]" Dkt. 7-1 at 26. Microsoft argues these statements

2    bring the collection, use, and disclosure of data within the scope of the MSA and its arbitration

3    agreement. Plaintiffs deny any indication the privacy statement is a part of the MSA or

4    subsumed within the definition of its "Terms," or that it covers the type of data at issue in this

5    case.

6    The parties also dispute the significance of the Edge EULA. Plaintiffs assert that the

7    EULA and MSA are separate and distinct and note that both discuss the privacy statement and

8    that the EULA does not contain an arbitration clause applicable to them as Windows users. *See*

9    Dkt. 48, Exs. B & C (including arbitration clause only for non-Windows users). Microsoft

10   asserts that the MSA and EULA are co-extensive, not mutually exclusive. Microsoft notes that

11   the EULA contemplates the application of other terms by its plain language. Dkt. 48 at 38

12   ("Your use of Other Services or of Software features that rely on Other Services may be

13   governed by separate terms and subject to separate privacy policies."); *see also id*. at 45.

14   Microsoft asserts that the agreements work together to explain users' rights regarding interrelated

15   products. For example, the EULA governs the Edge "software, its price, or this agreement,"

16   Dkt. 48 at 52, whereas the MSA governs, among other things, Bing and Microsoft accounts, Dkt.

17   7-1 at 32-35. Microsoft also, at oral argument, stated that the arbitration provision in the EULA

18   for non-Windows users would provide for arbitration where Edge was used on a non-Windows

19   device, whereas a variety of other terms exist and apply to Windows users.

20   As argued by Microsoft, Plaintiffs' allegations appear to touch matters covered by the

21   MSA in alleging privacy violations through Microsoft's data-collection practices. *See, e.g.*,

22   *Ramos v. Superior Ct.*, 28 Cal. App. 5th 1042, 1052-53, 239 Cal. Rptr. 3d 679 (2018), *as*

23   *modified* (Nov. 28, 2018) (finding that, while not alleging a violation of any term in a partnership

ORDER RE: MOTION TO COMPEL
ARBITRATION AND STAY CASE - 42

agreement, claims regarding salary reduction and denial of opportunities as an income partner

appeared to "'touch matters'" covered by and "have their 'roots in the relationship' created by"

the agreement) (quoted sources omitted).  Further, to the extent the arguments relating to the

privacy statement or Edge EULA identify ambiguities as to scope, the presumption favoring

arbitrability applies.  *See Columbia Export Terminal, LLC*, 23 F.4th at 847.  *See also AT&T*

*Techs., Inc.*, 475 U.S. at 650 ("'[W]here the contract contains an arbitration clause, there is a

presumption of arbitrability in the sense that '[a]n order to arbitrate the particular grievance

should not be denied unless it may be said with positive assurance that the arbitration clause is

not susceptible of an interpretation that covers the asserted dispute.  Doubts should be resolved in

favor of coverage.'") (quoting *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S.

574, 582–83 (1960)).[13]

The Court need not, in any event, resolve these arguments in order to conclude that

Plaintiffs' claims are encompassed by the agreement to arbitrate.  That is, at the least and as

discussed above, Plaintiffs' claims fall within the scope of the MSA and its arbitration clause

because they touch directly on their use of Microsoft accounts and Bing, both of which are

"Covered Services" under the terms of the MSA.

Plaintiffs rely on inapposite case law in arguing to the contrary.  For instance, in *Welch*,

871 F.3d at 794, 797-800, the Ninth Circuit found False Claims Act (FCA) claims of fraudulent

Medicaid billing did not fall within two arbitration clauses extending to employment-related

disputes because the conduct at issue in the case did not relate to employment, and did not fall

within a third clause extended to disputes between an employee and employer because FCA

---

[13] As argued by Microsoft, Plaintiffs' assertion that any ambiguity should be resolved in their favor appears to rest on case law addressing the construction of ambiguous terms, not the scope of an arbitration provision.  *See* Dkt. 47 at 27 & Dkt. 53 at 19-20.

1   claims "belong to the government" and are not between an employee and employer.  Plaintiffs

2   also point to *Jackson*, 65 F.4th at 1095, a case in which the Ninth Circuit found allegations that

3   Amazon spied on its delivery drivers in closed Facebook groups involved employer misconduct

4   "wholly unrelated" to the agreement.  Plaintiffs deem this case instructive in light of the

5   observation that, "even if [the named plaintiff] had no contract with Amazon but had been

6   permitted to join the [private Facebook] groups for some other reason, he would be able to bring

7   the same claims for invasion of privacy." *Id.* at 1103.  They assert the same is true here in that

8   Microsoft "spied on millions of users browsing Edge, regardless of whether they were logged in

9   to their Microsoft accounts, and regardless of whether they were using Microsoft accounts at

10  all." Dkt. 47 at 24-25.  However, in *Jackson*, 65 F.4th at 1104, the Ninth Circuit explained that

11  Amazon sought to compel arbitration under an employment-related agreement because the

12  alleged misconduct took place while the employees were performing deliveries under the

13  agreement, and despite the fact the misconduct was in no way related to the agreement.  Here, in

14  contrast, Plaintiffs allege misconduct related to the agreement by alleging interception of data

15  while Plaintiffs were logged in to their Microsoft accounts, using Bing, and in violation of their

16  rights to privacy.  The Court, for this reason and for the reasons stated above, finds the parties'

17  dispute encompassed by the parties' agreement.

18  F.    Unconscionability Challenges

19      Plaintiffs also argue the arbitration agreement is unenforceable because it is procedurally

20  and substantively unconscionable.[14]  As a general matter, procedural unconscionability concerns

21  _____

22  [14] Plaintiffs do not raise any challenge to the 2021 MSA delegation provision.  *See* Dkt. 47 at 28-31.  The Court, as such, herein considers the unconscionability challenges only in relation to the 2023

23  MSA.  *Caremark, LLC*, 43 F.4th at 1029 (explaining that, under *Rent-A-Center*, "a challenge to the validity of an entire arbitration agreement – there, an unconscionability challenge – must be decided by the arbitrator if the agreement includes a delegation clause that is not directly challenged[,]" and that a

ORDER RE:  MOTION TO COMPEL
ARBITRATION AND STAY CASE - 44

1    the manner in which parties enter into an agreement and their respective circumstances, while

2    substantive unconscionability exists where the terms of an agreement are one-sided or overly

3    harsh.  *See Houtchens*, 649 F. Supp. 3d at 943-44, and *Burnett v. Pagliacci Pizza, Inc.*, 196

4    Wn.2d 38, 54, 470 P.3d 486 (2020).  Under Washington law, a finding of either procedural or

5    substantive unconscionability suffices to void an agreement.  *Burnett*, 196 Wn.2d at 54.  Under

6    California law, both procedural and substantive unconscionability must be present, but not to the

7    same degree, such that, "[t]he more substantively oppressive the contract term, the less evidence

8    of procedural unconscionability is required[,]" and vice versa.  *Ronderos v. USF Reddaway, Inc.*,

9    115 F.4th 1080, 1089 (9th Cir.  2024) (cleaned up and quoted sources omitted).

10       The party asserting the defense bears the burden of proving unconscionability.  *Id.*  The

11   Court, for the reasons discussed below, concludes that Plaintiffs fail to establish either

12   procedural or substantive unconscionability, and therefore fail to undermine the enforceability of

13   the agreements to arbitrate.

14          1.    Procedural Unconscionability

15       Plaintiffs describe the MSA as a non-negotiable, "take it or leave it" contract of adhesion.

16   They assert procedural unconscionability in the denial of any meaningful opportunity to

17   negotiate or even review the extensive and convoluted terms of the MSA, its multiple hyperlinks,

18   and inconspicuous arbitration clause, or the many different versions of the privacy statement.

19   _____

20   party must challenge the delegation provision specifically for the court to intervene).  *See also Brennan*,
     796 F.3d at 1133 (to have a court address an unconscionability challenge, plaintiff "would have had to

21   argue that the agreement to delegate to an arbitrator his unconscionability claim was *itself*
     unconscionable.") (emphasis in original), and *Bielski*, 87 F.4th at 1008-11 (holding that, "to sufficiently

22   challenge a delegation provision, the party resisting arbitration must specifically reference the delegation
     provision and make arguments challenging it[,]" and that "a court need not . . . first evaluate the substance

23   of the challenge."; explaining the same arguments may be used to challenge both a delegation provision
     and arbitration agreement, "so long as the party articulates why the argument invalidates each specific
     provision.")

*See, e.g., Ting v. AT&T*, 319 F.3d 1126, 1149 (9th Cir. 2003) (agreement procedurally unconscionable where it was imposed on "customers without opportunity for negotiation, modification, or waiver."); *Burnett*, 196 Wn.2d at 56-57 (finding procedural unconscionability where plaintiff was not given notice and was unaware of arbitration provision when signing agreement).  They also point to Microsoft's vastly greater bargaining power.

Under both California and Washington law, an assessment of procedural unconscionability entails consideration of whether there was an absence of meaningful choice. *See Bielski*, 87 F.4th at 1013 (explaining that California law focuses on "'oppression or surprise due to unequal bargaining power[,]'" that oppression may be found "where unequal bargaining power results in 'no real negotiation and an absence of meaningful choice,'" and that surprise may be found "where 'the challenged term is hidden in a prolix printed form or is otherwise beyond the reasonable expectation of the weaker party[.]'") (citations omitted); *Burnett*, 196 Wn.2d at 54-55 (under Washington law, "[t]he key inquiry is whether the party lacked meaningful choice.")  The mere fact an agreement is an "adhesion contract" (i.e., a standardized contract imposed and drafted by the party with greater bargaining strength and only giving the weaker party the opportunity to adhere or reject it) does not suffice to establish unconscionability.  *Bielski*, 87 F.4th at 1014-15 (acknowledging some level of unconscionability necessarily existed due to contract's adhesive nature, but finding low levels of both procedural and substantive unconscionability and the contract enforceable where a pre-arbitration dispute resolution process was "neither hidden nor beyond the reasonable expectation of the user[,]" and the procedures were neither overly harsh, nor unfairly one-sided).  *See also Burnett*, 196 Wn.2d at 54-55 ("An adhesion contract is not necessarily procedurally unconscionable.")

1    Plaintiffs do not show the denial of a meaningful choice. As discussed above, the

2    evidence shows Plaintiffs were provided notice of and the opportunity to review the MSA and its

3    terms. *Contra Ting*, 319 F.3d at 1149 (defendant mailed agreement "in an envelope that few

4    customers realized contained a contract[.]"); *Burnett*, 196 Wn.2d at 56-57 (employment

5    agreement did not mention arbitration, arbitration policy appeared on page 18 of 23-page

6    handbook received after signing the agreement, and policy was not identified in the handbook's

7    table of contents). Nor is there any evidence before the Court showing Plaintiffs were required

8    to open a Microsoft account in order to utilize Microsoft services. Plaintiffs do not, under these

9    circumstances, demonstrate procedural unconscionability.

10    2.    <u>Substantive Unconscionability</u>

11    Plaintiffs first argue that the arbitration provision is substantively unconscionable in that

12    it violates California law under *McGill v. Citibank, N.A.*, 2 Cal. 5th 945, 952, 961-67, 393 P.3d

13    85 (2017), by banning public injunctive relief. *See* Dkt. 1-1 at 26 (2023 MSA § 15 (providing

14    that requests for public injunctions are not allowed)). The parties dispute and offer extensive

15    argument on the question of whether Plaintiffs seek public injunctive relief. *See* Dkt. 47 at 31;

16    Dkt. 53 at 22; Dkt. 61 at 5-7; Dkt. 66 at 6-8. Plaintiffs do not, however, offer any response to

17    Microsoft's contention that, even if Plaintiffs seek public injunctive relief, the arbitration

18    agreement is consistent with *McGill* in providing that the arbitrator decides liability and, upon a

19    finding of liability, the parties would return to the Court for a ruling on public injunctive relief.

20    Dkt. 7-1 at 27 (2023 MSA § 15(g) (severability clause providing that "the parties agree to

21    arbitrate all claims and remedies subject to arbitration before litigating in court any remaining

22    claims or remedy (such as a request for public injunction remedy, in which case the arbitrator

23    issues an award on liability and individual relief before a court considers that request).")

The Court finds Microsoft's unopposed argument persuasive, and finds no substantive unconscionability.  *See Blair v. Rent-A-Ctr., Inc.*, 928 F.3d 819, 827, 831 (9th Cir. 2019) (explaining that "the *McGill* rule expresses no preference as to whether public injunction claims are litigated or arbitrated, it merely prohibits the waiver of the right to pursue those claims *in any forum*."; recognizing that, while not done in that case, "[p]arties are welcome to agree to split decisionmaking between a court and an arbitrator" such that the arbitrator first decides liability and the remedy is addressed by a court) (emphasis added); *Ferguson v. Corinthian Colleges, Inc.*, 733 F.3d 928, 937 (9th Cir. 2013) (noting plaintiffs could return to court to seek public injunctive relief); *Fama v. Opportunity Fin. LLC*, C23-5477-BAT, 2023 WL 9954028, at *9 (W.D. Wash. Oct. 10, 2023) (finding nothing substantively unconscionable about arbitration clause that provided requests for public injunctive relief could proceed in court, and noting courts have repeatedly approved this approach) (cited cases omitted).  *See also J.A. through Allen v. Microsoft Corp.*, C20-0640-RSM-MAT, 2021 WL 1723454, at *9 (W.D. Wash. Apr. 2, 2021) (noting that, following determination by arbitrator pursuant to MSA's delegation clause, the case would return to the court for a determination as to public injunctive relief), *report and recommendation adopted*, 2021 WL 1720961 (W.D. Wash. Apr. 30, 2021).  To the extent Plaintiffs seek public injunctive relief, the Court will retain jurisdiction over the adjudication of that relief pending a determination as to liability.  *See, e.g., Nguyen v. Tesla, Inc.*, C19-1422, 2020 WL 2114937, at *5 (C.D. Cal. Apr. 6, 2020); *Dornaus v. Best Buy Co.*, C18-4085, 2019 WL 632957, at *6 (N.D. Cal. Feb. 14, 2019).

Plaintiffs next argue that the MSA is inherently one-sided in allowing for the modification of substantive terms and their retroactive application.  *See* Dkt. 7-1 at 8 (2023 MSA § 7).  However, as the Ninth Circuit recently observed, the "'mere presence' of a unilateral

1  modification clause does not render the arbitration clause, *a separate provision*, substantively

2  unconscionable." *Patrick*, 93 F.4th at 479-80 (emphasis in original; internal footnote omitted).

3  *Accord Tompkins v. 23andMe, Inc.*, 840 F.3d 1016, 1033 (9th Cir. 2016) (also noting that

4  "California courts have held that the implied covenant of good faith and fair dealing prevents a

5  party from exercising its rights under a unilateral modification clause in a way that would make

6  it unconscionable."); *Ekin v. Amazon Servs., LLC*, 84 F. Supp. 3d 1172, 1175-76 (W.D. Wash.

7  2014) (adding that "Washington and Ninth Circuit courts have a history of enforcing contracts

8  containing change-in-terms provisions.")  The Court finds no merit to Plaintiffs' argument.

9      Plaintiffs, finally, argue that the MSA is substantively unconscionable in that it

10  undermines legal recourse through the limitation of liability and damages.  *See* Dkt. 7-1 at 13

11  (2023 MSA § 13 ("Limitation of Liability" clause)).  However, as Microsoft observes, this

12  argument raises a dispute with the terms of the MSA, not a defense to the enforceability of the

13  arbitration agreement, *see id*. at 26 (2023 MSA § 15).  It is, as such, an issue for the arbitrator to

14  decide.  *See Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445-46 (2006) (holding

15  that, "as a matter of substantive federal arbitration law, an arbitration provision is severable from

16  the remainder of the contract," and that, "unless the challenge is to the arbitration clause itself,

17  the issue of the contract's validity is considered by the arbitrator in the first instance."); *Shivkov*

18  *v. Artex Risk Sols. Inc.*, C18-4514, 2019 WL 8806260, at *7 (D. Ariz. Aug. 5, 2019) (finding

19  that, where limitation of liability provision was not part of the arbitration clause and applied to

20  any dispute between the parties, plaintiffs' substantive unconscionability objection went to the

21  validity of the agreements as a whole, not the arbitration clause, and must be resolved by the

22  arbitrator, not the court), *aff'd*, 974 F.3d 1051 (9th Cir. 2020).

23      / / /

G.    <u>Plaintiff M.C.</u>

Microsoft does not provide evidence showing Plaintiff M.C. agreed to the MSA, asserting counsel for Plaintiffs refused to provide an email address used by M.C. to create a Microsoft account.  *See* Dkt. 8, ¶4 & Ex. C.  Microsoft nonetheless moves to compel M.C. to arbitrate, pointing to his allegation he was "almost always" logged in to his Microsoft account while using Edge.  Dkt. 1-1, ¶23.

Plaintiffs provide a declaration from M.C.'s parent attesting that, upon review of the Microsoft account creation process, M.C. confirmed he never created a Microsoft account, and disaffirms any terms and conditions purportedly related to his use of Edge on his personal computer.  Dkt. 57-1, ¶¶6, 14.  Plaintiffs argue that, because M.C. never created a Microsoft account for himself, the MSA and its arbitration provision do not apply to him, he cannot be compelled to arbitrate, and he should be allowed to proceed with his claims, as class representative, in this Court.  Plaintiffs assert that, given the early stage of these proceedings, they should have the opportunity to correct a factual misunderstanding, and will move to amend the Complaint if arbitration is not compelled.

Microsoft argues the declaration from M.C.'s parent is inadmissible hearsay that should not be considered by the Court, *see* Dkt. 53 at 13, n.5, that M.C. fails to meet his burden to establish disaffirmance, *see id*. at 20, n.9, and that, because Plaintiffs have not amended their Complaint, M.C. remains conclusively bound by his judicial admission, *see* Dkt. 62 at 7, 15; Dkt. 66 at 9.  Microsoft further asserts its belief that M.C.'s parent has a Microsoft account and asks that, if M.C. is allowed to disavow his prior allegation, the Court allow Microsoft to take limited discovery from M.C. and his parents to explore the factual inconsistency and the question of whether M.C. used a parent's account to browse Edge, and to determine its right to compel

arbitration based on M.C.'s use of Edge while logged in to a Microsoft account.  *See* Dkt. 7-1 at 4-5 (2023 MSA § 4(a)(iii) (MSA provision governing use of Microsoft accounts by minors)).

Microsoft does not provide any evidence to support a contention that M.C. is bound to an agreement to arbitrate.  The Court therefore cannot compel M.C. to proceed to arbitration.  The Court is nonetheless troubled by the discrepancy between the allegations in the Complaint and the declaration offered by M.C.'s parent, and finds any conclusion regarding M.C.'s ability to proceed in this litigation premature.  The Court therefore declines to further address the issue at this juncture, and instead directs the parties to meet and confer regarding a timeline for limited further proceedings.  The timeline may include, for example, the filing of a motion to amend, discovery on the question of whether M.C. created or used a Microsoft account, and, if warranted, a renewed motion to compel arbitration or some other motion relating to M.C.

<u>CONCLUSION</u>

The Court finds Plaintiffs Saeedy, Shah, and Wilkinson bound to agreements to arbitrate their claims on an individual basis, but an absence of evidence sufficient to reach that conclusion in relation to Plaintiff M.C.  Accordingly, Microsoft's Motion to Compel Arbitration and Stay Case, Dkts. 6 & 56-1, is GRANTED in part and DENIED in part.  The Court GRANTS the motion in relation to Saeedy, Shah, and Wilkinson, stays these proceedings as related to those Plaintiffs pending the outcome of the individual arbitration of their claims, and directs the parties to file a joint status report upon the completion of that arbitration.  The Court DENIES the motion in relation to M.C., and directs the parties to meet and confer and to provide the Court,

/ / /

/ / /

/ / /

1    within **twenty (20) days** of the date of this Order, the proposed timeline described above.

2        Dated this 21st day of November, 2024.

3

4

5        S. KATE VAUGHAN
         United States Magistrate Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23